**UNITED STATES of America, Appellee,**

v.

**Clayton Eugene DEFRIES, a/k/a Gene, et al., Appellants.**

**Nos. 96–3015, 96–3016.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1997.

Decided Dec. 2, 1997.

Stuart A. Levey, Washington, DC, appointed by the court, and Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellants. With them on the briefs were A.J. Kramer, Federal Public Defender, R. Stan Mortenson, Scott L. Nelson, Daniel J. Cloherty, Gerard F. Treanor, Jr., and Judith L. Wheat, appointed by the court.

Frank J. Marine, Deputy Chief, U.S. Department of Justice, Washington, DC, argued the cause for appellee. With him on the briefs was Sotiris A. Planzos, Trial Attorney.

Before: SILBERMAN, ROGERS and TATEL, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:

Two former elected officials of a maritime union challenge their convictions for Racketeer Influence and Corrupt Organizations Act ("RICO") violations, RICO conspiracy,

embezzlement, and mail fraud. We reverse their convictions.

## I. Background

District No. 1–Pacific Coast District, Marine Engineers' Beneficial Association ("PCD/MEBA," or the "pre-merger union") was a national union made up of mostly licensed marine engineers who manned American merchant vessels. Under the union's by-laws, an elected District Executive Committee governed the union's operations. In 1984, PCD/MEBA elected appellant Clayton Eugene DeFries president and appellant Clyde E. Dodson executive vice president and branch agent for the Port of San Francisco. The membership also elected twenty-one individuals as delegates to the convention of the National MEBA, an umbrella organization of various unions, which in 1986 elected DeFries National MEBA President and Dodson National MEBA secretary-treasurer. In the union's 1987 election, the membership reelected DeFries and Dodson to their Committee positions.

Just prior to the 1987 election, DeFries negotiated, on behalf of the Committee, an agreement to merge PCD/MEBA with the National Maritime Union ("NMU"), a much larger, predominantly blue-collar union made up of unlicensed seamen. In March 1988, PCD/MEBA approved the merger agreement in a membership referendum, as did NMU. As specified in the merger agreement, a six-person committee consisting of three former NMU officials and three former PCD/MEBA officers, including DeFries and Dodson, governed the new union, MEBA/NMU (the "post-merger union").

At the time the merger became effective, appellants and other former officers of the pre-merger union received severance payments totaling almost $2 million, even though they immediately assumed roughly equivalent positions in the newly merged union's leadership. The pre-merger union's bylaws authorized the Committee to establish compensation levels for all union officers and employees, "unless otherwise directed by a majority vote of the membership." Pursuant to that authority, the Committee adopted a formal, written severance plan, later amended it to make its triggering date the merger of the two unions. With regard to both the adoption and amendment of the severance plan, the Committee sought the advice of the firm's outside counsel, Angelo Arcadipane, a member of the law firm of Dickstein, Shapiro & Morin, who advised appellants that the severance plan was legal and that the Committee had authority to adopt it.

At trial, government witnesses testified that between the time of the severance plan's adoption in 1986 and the distribution of the payments in 1988, DeFries, Dodson, and other Committee members took steps to conceal from the union membership the adoption, terms, and triggering event of the plan. These witnesses testified that Committee members failed to mention the plan in the minutes of the meeting at which they adopted it, directing the union's controller not to reveal any details of the plan. According to these witnesses, the Committee also failed to disclose the plan's existence to the union's independent auditor until more than a year after its adoption. When the union membership eventually learned of the severance payments, a group filed suit to recover the money.

As part of the merger, the post-merger union was divided into two divisions—the Licensed Division, which consisted of the former PCD/MEBA members, and the Unlicensed Division, which was made up of former NMU members. The Licensed Division held an election in 1989 to select its delegates to the National MEBA Convention; those elected included DeFries and Dodson. The Licensed Division held another election in 1990, this time electing officers as well as delegates to the National MEBA Convention. This was the first time that appellants and their supporters faced substantial opposition. In a hotly contested election, the challengers defeated the incumbents, including Dodson (DeFries was not up for reelection).

According to the evidence at trial, in the 1988, 1989, and 1990 elections appellants and other union leaders solicited and collected unmarked and unsealed ballots, voting them in favor of appellants' interests. The evidence also showed that some tampering of collected ballots occurred, including opening

sealed ballots and replacing those ballots voted against appellants' interests with new ballots voted in their favor.

A federal grand jury returned a ten-count indictment against DeFries, Dodson, and fourteen other former union officials. The indictment charged appellants with one count of racketeering in violation of RICO, 18 U.S.C. § 1962(c) (1994); one count of conspiracy to violate RICO, 18 U.S.C. § 1962(d) (1994); one count of embezzlement with respect to the severance payments, 29 U.S.C. § 501(c) (1994); and three counts of mail fraud, 18 U.S.C. § 1341 (1994), with regard to the 1988 merger referendum, the 1989 national delegate election, and the 1990 union officers' election. The RICO count included two charges of mail fraud with regard to the 1984 and 1987 elections as two of the alleged racketeering acts; it also incorporated the other mail fraud counts and the embezzlement count as racketeering acts. A seventh racketeering act incorporated one count of extortion but did not apply to appellants. The RICO conspiracy count incorporated all seven racketeering acts of the RICO count.

The district court severed the case against appellants and five others from that of the other nine defendants, and also dismissed the 1988 merger referendum mail fraud count as failing to allege a scheme to defraud "property" under *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). After the government took an interlocutory appeal challenging the dismissal, this court reversed the district court and reinstated the count, issuing our opinion on January 13, 1995, and ultimately our mandate on March 1.

In the meantime, on February 1, the deputy clerk swore the ninety-one individuals on the jury venire for this case, who then completed an extensive juror questionnaire. Two days later, just prior to the prospective jurors' return to the courtroom for formal, in-person questioning by counsel, appellants moved to stay jury selection on the grounds that self-selection tainted the jury panel summoned in this case in violation of the Jury Selection and Service Act, 28 U.S.C. § 1866(a) (1994), and that white jurors were systematically underrepresented on the panel in violation of the Sixth Amendment's fair-cross-section requirement, U.S. Const. amend. VI. Refusing to stay jury selection, the district court allowed discovery of the juror summonses and juror qualification forms for all jurors summoned for service for the period of February 1–15, including any requests for deferral. Ruling that appellants failed to show that the Jury Office's granting of hardship deferrals was either motivated by discrimination or arbitrary and capricious, the district court denied the jury selection motions.

At the end of the government's case-in-chief and again at the close of all evidence, appellants moved for judgment of acquittal on the embezzlement count, arguing that lack of authorization is an essential element of 29 U.S.C. § 501(c) and that the government failed to present any evidence showing that the severance payments were unauthorized. Faced with a circuit split over whether lack of authorization is an element of a section 501(c) violation, the district court denied the motion on both occasions, electing to treat authorization as one factor for the jury to consider when evaluating whether appellants had the requisite fraudulent intent to commit the crime.

After the district court denied the motions for judgment of acquittal, appellants requested an advice-of-counsel instruction on the embezzlement count. Specifically, they asked the district court to instruct the jury that if it found that appellants, in creating the severance plan and taking the severance payments, had relied in good faith on the advice of the union's outside counsel, then they must be acquitted under section 501(c) because they would not have had the requisite fraudulent intent to embezzle the union's funds. Ruling that appellants had not presented sufficient evidence that they had relied on their attorney's advice, the district court refused to give the requested instruction.

Appellants also objected to the district court's instructions on the RICO and RICO conspiracy counts, as well as on the mail fraud counts. Although appellants presented evidence disputing whether a single enterprise of the pre-merger and post-merger un-

ions constituted a single RICO enterprise, as the indictment alleged, the district court instructed the jury to "regard the two unions as a single enterprise." In addition, the district court instructed the jury that it could convict appellants of mail fraud based on their participation in a scheme to defraud union members of their right to secret ballots and fair elections, which appellants now contend is not within the reach of the mail fraud statute.

The jury found appellants guilty on all counts. After appellants waived their right to a trial by jury on RICO forfeiture and following an evidentiary hearing, the court ordered forfeiture of the severance payments and all salaries earned by appellants from 1985 to 1990. The court sentenced DeFries to concurrent terms of sixty-three months of imprisonment on the RICO and RICO conspiracy counts and sixty months of imprisonment on the embezzlement and mail fraud counts, with three years of supervised release. Dodson received concurrent terms of fifty-seven months of imprisonment on all six counts, with three years of supervised release. The court ordered appellants to pay certain fines, restitution, and costs of confinement. Appellants now appeal their convictions and the district court's forfeiture ruling. A third appellant, Claude W. Daulley, passed away the day before we heard oral argument. In response to the "suggestion of death" filed by Daulley's counsel, we have dismissed Daulley's appeal.

## II. Jury Venire Issues

Appellants raise both a statutory and a constitutional challenge to the racial composition of their jury venire. They maintain that white jurors were systematically underrepresented in the juror pool they received. According to appellants, white jurors constitute roughly a third of the population in the District of Columbia eligible to serve on juries, yet constituted only 23% of the jurors drawn for appellants' venire. This disparity, appel-

lants maintain, is due in part to the fact that potential white jurors were more likely than nonwhites to obtain hardship deferrals of their jury service—at least half of the fifty-four deferrals in the jury pool used by the district court for the venire in appellants' trial were white. Appellants therefore contend that the low number of white people in their venire violated both the Jury Selection and Service Act ("Jury Selection Act"), which codifies the right to a jury "selected at random from a fair cross section of the community," 28 U.S.C. § 1861 (1994), and the Sixth Amendment, which guarantees criminal defendants the right to trial "by an impartial jury." We conclude that appellants have failed to meet their evidentiary burden to show their rights were violated.

*Jury Selection and Service Act Claim*

The government argues for the first time on appeal that appellants' Jury Selection Act contention is untimely. Relying on cases stating that the timeliness requirement "is to be strictly construed," *United States v. Bearden,* 659 F.2d 590, 595 (5th Cir. Unit B 1981); *accord United States v. Contreras,* 108 F.3d 1255, 1266 (10th Cir.1997); *United States v. Paradies,* 98 F.3d 1266, 1277 (11th Cir.1996); *United States v. Young,* 822 F.2d 1234, 1239 (2d Cir.1987), the government notes that "voir dire" began on February 1, 1995, but appellants did not file their motion objecting to the venire until February 3, 1995.

The Jury Selection Act requires that any motion to dismiss the indictment or stay the proceedings on the ground of a substantial failure to comply with the statute must be filed no later than "before the voir dire examination begins." 28 U.S.C. § 1867(a) (1994).[1] Appellants filed their motion to stay proceedings on Friday morning, February 3, 1995, and promptly brought it to the attention of the district court. This was two days after they had first seen the members of the jury venire in person, on Wednesday, February 1, 1995, and after the members of the

---

1. Section 1867(a) provides:

 In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury. 18 U.S.C. § 1867(a).

jury venire had responded in writing to a detailed written questionnaire. That questionnaire consisted of questions that the district court had approved after receiving suggested questions from appellants' counsel and the prosecutor. Because the questionnaire, particularly in view of appellants' participation in determining its content, could be viewed as the initial phase of voir dire examination, *see, e.g., United States v. George (In re Washington Post)*, 20 Media L. Rep. (BNA) 1511, 1511 (D.D.C.1992), appellants' motion would appear to be untimely.

The difficulty with this conclusion arises from the fact that the Jury Selection Act and the jury selection procedures utilized by the district court effectively foreclosed the filing of appellants' motion at an earlier time. The Jury Selection Act required appellants both to file their motion before the voir dire examination began, and to support it with a sworn statement of facts that, if true, would demonstrate a substantial failure to comply with the statute.[2] *See* 28 U.S.C. § 1867(d); *Bearden*, 659 F.2d at 597; *United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir.1977). Yet, appellants did not see a list of the jurors who would be in their venire until the members of the jury venire were brought into the courtroom on Wednesday, February 1, 1995. Even if they could have seen the list of venire jurors in the jury office, *see* 28 U.S.C. § 1867(f), prior to that date, the list would not have included information on the ethnicity or gender of the jurors. Nor is it clear on this record that appellants could have obtained the information from another source prior to trial. The absence of such information precluded appellants from providing a detailed and supported motion outlining their jury concerns at the moment they first learned, at least by eyesight, of the ethnic and gender composition of the jury on February 1, 1995.

The Fifth Circuit has indicated that it might waive a procedural requirement of the Jury Selection Act if circumstances indicated that "counsel could not reasonably have been expected to comply with the procedural prerequisites to a statutory challenge to the jury." *Kennedy*, 548 F.2d at 613. Assuming that the government has not waived its timeliness objection, we need not decide whether appellants would be entitled to such an exception, because appellants' Jury Selection Act claim is unsupported by the evidence necessary for the court to conclude that there has been a "substantial" violation of the Jury Selection Act.[3] 28 U.S.C. § 1867(a); *United States v. Spriggs*, 102 F.3d 1245, 1251 (D.C.Cir.1996); *United States v. Barnette*, 800 F.2d 1558, 1567 (11th Cir.1986).

To succeed on their Jury Selection Act contention, appellants must demonstrate a substantial violation of the two related goals of the statute: random selection and objective disqualifications. *See* 28 U.S.C. §§ 1861, 1866(c); *Spriggs*, 102 F.3d at 1251; *United States v. North*, 910 F.2d 843, 909 (D.C.Cir.1990). Appellants maintain that the jury office in this district grants hardship deferments more liberally than the Jury Selection Act permits, *see* 28 U.S.C. § 1866(c)(1), and then recalls deferred jurors en masse, rather than distributing them evenly among the venires. As a result of the combination of these two practices, appellants contend, some venires are disproportionately white because they are composed in part of disproportionately white deferred jurors.

Although such a practice would be cause for concern, *see* 28 U.S.C. § 1866(c), appellants have produced almost no evidence of its existence, let alone evidence that it was a regular occurrence that produced a substantial violation of the Jury Selection Act. They rely solely on counsel's declaration that "[o]n February 13, 1995, I learned that no previously deferred jurors have been added to any jury group in this Court since approximately October, 1994." Such hearsay information

---

2. Congress intended that "[t]his threshold requirement to a successful challenge will make it possible for the judge to review a challenge motion and swiftly dispose of it if it fails, on its face, to state a case for which a remedy could be granted." H.R.Rep. No. 90–1076 (1968), *reprinted in* 1968 *U.S.C.C.A.N.* 1792, 1806.

3. In light of our disposition, we need not address the government's contention, also raised for the first time on appeal, that the sworn statement accompanying appellants' motion was deficient. *See* 28 U.S.C. § 1867(d).

does not demonstrate that the jury office deferral practices in this district substantially violate the statute. *See, e.g., United States v. Layton,* 519 F.Supp. 946, 955 (N.D.Cal.1981).

*Sixth Amendment Claim*

 Appellants' Sixth Amendment contention fares no better. The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury." The Supreme Court has held that an "impartial jury" is one drawn from a "representative cross-section of the community." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires for which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).[4] Appellants contend that the disparity between the percentage of whites in their venire and the percentage of eligible white jurors in the District of Columbia suggests that whites are systematically excluded from juries in the district court. They point to the evidence that although whites comprise approximately one-third of the eligible jurors in the district, they comprised only 23% of the venire in their case. Yet appellants cannot show on the basis of this single instance of disparity that there has been a systematic exclusion of whites from the jury. *Cf., e.g. Duren,* 439 U.S. at 366, 99 S.Ct. at 669–70 (reversing conviction on the basis of jury selection prac-

tices over a year); *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977) (same, over a decade). Underrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the "systematic exclusion of the group" required by *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. *See, e.g., United States v. Ruiz–Castro,* 92 F.3d 1519, 1527 (10th Cir.1996); *United States v. Hardwell,* 80 F.3d 1471, 1486 (10th Cir.1996); *Ford v. Seabold,* 841 F.2d 677, 685 (6th Cir. 1988); *Timmel v. Phillips,* 799 F.2d 1083, 1086–87 (5th Cir.1986); *United States v. Jones,* 687 F.2d 1265, 1269–70 (8th Cir.1982). From a small sample size based on one venire it is difficult to determine whether the disparity is random or systemic.

Accordingly, because appellants have not produced evidence that would demonstrate either a substantial violation of the Jury Selection Act or a substantial underrepresentation as would violate their Sixth Amendment right, their jury venire contentions fail.[5]

### III. Mail Fraud Issues

*Jurisdiction over the 1988 Merger Referendum Mail Fraud Count*

 The federal mail fraud statute makes it unlawful to use the U.S. mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. One count of the indictment charged appellants under section 1341 for using the mails to advance a scheme (1) to defraud the union of its property—that is, the ballots for the 1988 merger referendum—and (2) to defraud union members of their right to secret ballots and to participate in a fair and honest election regarding the merger referendum. Ruling that this count failed to allege a fraudu-

---

**4.** Appellants were not required, however, to show a purposeful exclusion of whites from the jury to succeed on their Sixth Amendment claim. *Spriggs,* 102 F.3d at 1254. To the extent that the district court suggested otherwise when it concluded that the jury office made "no deliberate policy choice" to exclude whites because they were white, it erred.

**5.** The import of appellants' evidence is troubling, however, in view of the random selection requirement of the Jury Selection Act, 28 U.S.C. § 1861, and the fact that the statistical disparities, if supported by a larger sample and stronger evidence of the non-random recall of deferred jurors, could support an inference that a jury venire was not composed of a fair cross-section of the community. *See Taylor,* 419 U.S. at 528, 95 S.Ct. at 696–97.

lent scheme to obtain "property," the district court dismissed it, relying on *McNally v. United States*, which overturned a mail fraud conviction that rested on the theory that the defendants deprived a state's citizens and government of the right to have the state's affairs conducted honestly. 483 U.S. at 361, 107 S.Ct. at 2882. In *McNally*, the Court held that when enacting the mail fraud statute, Congress intended to prevent the use of the mails in furtherance of schemes to defraud others of money or "property" as traditionally defined, not of the "intangible" right to an honest and impartial government. 483 U.S. at 356–59, 107 S.Ct. at 2879–81.

The government filed an interlocutory appeal, challenging the district court's dismissal of the mail fraud count. On January 13, 1995, we reversed the district court and reinstated the count, ruling that the referendum ballots and the information they contained did in fact constitute "property" protected under section 1341. *United States v. De-Fries*, 43 F.3d 707, 711 (D.C.Cir.1995). Pursuant to D.C. Circuit Rule 41, we withheld issuance of our mandate until seven days after disposition of any timely petition for rehearing. *See* D.C.Cir. R. 41.

Three weeks later, on February 7, the government moved for expedited issuance of our mandate, pointing out that the district court was almost ready to swear a jury. The next day, appellants filed an opposition to the government's motion to expedite as well as a petition for rehearing and a suggestion for rehearing en banc. Rather than issuing our mandate on February 10, we ordered the government to respond to appellants' pending rehearing petitions. On February 10, the government filed its reply to appellants' opposition to expedited issuance of the mandate, and on February 14 asked the district court to consider delaying empaneling the jury until this court issued its mandate. The district judge and counsel for the government discussed the implications of the fact that this court had not issued its mandate, expressing uncertainty as to the district court's ability to proceed to trial on that count prior to the mandate's issuance. When asked by the court, counsel for appellants said he thought the district court lacked jur-

isdiction absent the mandate, explaining that "the mandate is key here. And ... the court of appeals understands that." Appellants' counsel also explained why he thought this court delayed issuing the mandate: "[W]hat the court of appeals, I think, is looking at is the prospect that if it sends the mandate back and the case goes forward and then you're in the midst of trial and they have to recall the mandate, then you have got real problems." The district court took no action on the government's request, but on February 21, once jury selection was completed, the district court again raised the question of our mandate. After confirming that the mandate had not issued, counsel for the government, citing *United States v. Salerno*, 868 F.2d 524 (2d Cir.1989), argued that the court could proceed. The next day, the district court empaneled and swore the jury. On February 24, the government filed its reply to appellants' rehearing petition. On March 1, after the trial had been underway for a week, we issued our mandate. Over a month later, on April 7, we denied appellants' petition for rehearing. Appellants now argue that because we had not issued our mandate until after trial began, the district court lacked jurisdiction to proceed on the mail fraud count. Reviewing this jurisdictional claim *de novo, see Board of Trustees v. Madison Hotel, Inc.*, 97 F.3d 1479, 1483 (D.C.Cir. 1996), we agree.

The relationship between district court jurisdiction and the issuance of the appeals court mandate is clear and well-known: The filing of a notice of appeal, including an interlocutory appeal, "confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam). The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate. *Johnson v. Bechtel Associates Professional Corp.*, 801 F.2d 412, 415 (D.C.Cir.1986) (per curiam). Courts have carved out a few narrow exceptions to this rule, such as where the defendant frivolously appeals, *see United States v. LaMere*, 951 F.2d 1106, 1109 (9th Cir.1991) (per curiam),

or takes an interlocutory appeal from a non-appealable order, *see United States v. Green,* 882 F.2d 999, 1001 (5th Cir.1989).

Asking us to create an additional exception, the government argues that because we had issued our opinion by the time trial began, proceeding to trial prior to the issuance of the mandate neither caused confusion nor wasted judicial resources and thus did not contravene the purposes of the general rule on jurisdiction. As it did in the district court, the government relies primarily on *Salerno,* where the Second Circuit issued an order rejecting the defendants' interlocutory double jeopardy appeal, stating that a formal opinion would follow but also acknowledging that the trial was to begin that very same day. When defendants later challenged the district court's jurisdiction to try the case prior to the mandate's issuance, the Second Circuit held that the district court did indeed have jurisdiction when the case went to trial because the likelihood that the district court's ruling on double jeopardy would be affirmed "hardened into a certitude when [the appeals] court issued its order." *Salerno,* 868 F.2d at 540.

Involving "admittedly unusual" facts, *id.,* *Salerno* has no applicability to the case before us today. By clearly acknowledging the trial was to start on the very same day that it issued its order, the Second Circuit led the district court into believing it had jurisdiction to proceed with the trial. We gave no such message to the district court. To the contrary, when the government moved for expedited issuance of the mandate so that the district court could proceed to trial as scheduled, instead of immediately responding, we directed the government to reply to appellants' pending rehearing motions. The fact that one judge voted to rehear the case *in banc* demonstrates that this court was seriously considering the rehearing motions. Moreover, it is clear from the February 14 colloquy that both the government and the district judge clearly understood that this court had not completed its consideration of the issues raised in the interlocutory appeal, and that there was at least a serious question about the district court's jurisdiction. Unlike in *Salerno,* nothing had "hardened into a

certitude" at the time the district court, choosing to disregard the fact that our mandate had not issued, proceeded to swear the jury and begin the trial. The district court thus lacked jurisdiction over the merger referendum mail fraud count when it proceeded to trial on February 22. We therefore reverse appellants' section 1341 convictions involving the 1988 merger referendum.

In reaching this conclusion, we fully understand that appellants' trial took several months, consuming thousands of hours of court and lawyer time. The mandate rule, however, is clear, well-established, and grounded in solid considerations of efficient judicial administration. Because "jurisdiction is the power to act," it is essential that well-defined, predictable rules identify which court has that power at any given time. *Kusay v. United States,* 62 F.3d 192, 194 (7th Cir.1995). The mandate rule prevents the waste of judicial resources that might result if a district court, prior to the issuance of the appeals court's mandate, proceeds with a case, ruling on motions and hearing evidence, after which the appeals court reverses its original decision on rehearing. That we ultimately sustained the district court's jurisdiction in this case is of no moment; district court jurisdiction cannot turn on retrospective examination of appeals court action. Where, as here, our mandate had not issued, the district court lacked jurisdiction to proceed with trial whether we later sustained its jurisdiction or not. Fully aware that our mandate had not issued, the district court chose to proceed with trial. If the government wishes, the district court must now rehear the case.

*Jury Instructions Regarding the 1989 and 1990 Election Mail Fraud Counts*

■ Appellants challenge their other two mail fraud convictions—stemming from the 1989 national delegate election and the 1990 union officers' election—arguing that the district court's instructions enabled the jury to convict on the basis of activity not criminalized by the statute. Whether the district court properly instructed the jury on the standard for convicting appellants of mail fraud presents a question of law that we review *de novo. See United States v. White,*

116 F.3d 903, 924 (D.C.Cir.1997) (per curiam). We "must determine whether, taken as a whole, [the instructions] accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Washington,* 106 F.3d 983, 1002 (D.C.Cir.) (per curiam), *cert. denied,* —— U.S. ——, 118 S.Ct. 446, —— L.Ed.2d —— (1997).

■ Like the 1988 merger referendum mail fraud count, the 1989 and 1990 mail fraud counts alleged a scheme to defraud the union of its ballots and to defraud union members of their right to secret ballots and fair elections. These counts also alleged that DeFries and Dodson schemed to defraud union members of their right to honest services of their union officers, agents, and representatives. This third theory was available for the 1989 and 1990 mail fraud counts, but not the 1988 merger referendum count, because in 1988 Congress responded to the *McNally* decision by amending the mail fraud statute to protect against schemes to deprive individuals of the intangible right of honest services as well as of money and property. 18 U.S.C. § 1346 (1994). Over appellants' objection that in our earlier *DeFries* opinion we had declined to hold that section 1341 protected the right to fair elections, *see* 43 F.3d at 709, 711, the district court instructed the jury on all three theories.

Appellants' challenge raises important questions about the mail fraud statute's reach. They argue that because the district court failed to instruct the jury that it had to find that the union's ballots were stolen or tampered with or that the union officers provided dishonest services, the jury could have convicted them solely because they engaged in proxy-voting, which they claim does not violate the statute. In considering this argument, we must first decide whether the mail fraud statute protects against schemes to defraud individuals of their right to secret ballots and fair elections. If we answer that question in the negative, then we must also decide whether proxy-voting constitutes a deprivation of union officials' "honest services."

As to the first question, the Supreme Court held in *McNally* that section 1341 does not protect the intangible right of the citizenry to good government, clearly stating that the statute protects individuals against schemes to deprive them of their money or property only. *McNally,* 483 U.S. at 356, 107 S.Ct. at 2879–80. Elaborating on this holding five months later, the Court explained that the right to honest governmental services is "an interest too ethereal in itself" to merit the statute's protection. *Carpenter v. United States,* 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (extending *McNally* to the wire fraud statute, 18 U.S.C. § 1343). Prior to the honest services amendment to the mail fraud statute, three of our sister circuits held that under *McNally,* union members' right to fair elections is a similarly "ethereal" interest that does not constitute "property" under section 1341. *See United States v. Townsley,* 843 F.2d 1070, 1080 (8th Cir.), *aff'd in part and vacated in part en banc on other grounds,* 856 F.2d 1189 (8th Cir.1988); *Ingber v. Enzor,* 841 F.2d 450, 451 (2d Cir.1988); *United States v. Gordon,* 836 F.2d 1312, 1314 (11th Cir.1988) (per curiam). We agree. We think it particularly instructive that, in explaining the types of schemes that could not properly support a conviction under section 1341, the *McNally* Court referred to two election fraud cases as examples. 483 U.S. at 358, 107 S.Ct. at 2880–81 (citing *United States v. Clapps,* 732 F.2d 1148, 1152 (3d Cir.1984), and *United States v. States,* 488 F.2d 761, 764 (8th Cir. 1973)).

The honest services amendment does not extend to all election practices that might be thought unfair. The jury could legitimately have convicted DeFries and Dodson of mail fraud only by finding that they participated in a scheme to defraud the union of its ballots or the union members of their right to appellants' honest services as union officers. The record contains adequate evidence to support such a conviction. The government presented credible though contested evidence that DeFries and Dodson participated in a scheme to tamper with election ballots in which union officials opened sealed ballots to see if they had been voted in favor of appellants' interests, discarding and replacing those ballots that had not. The government also presented evidence that union officials

coercively collected ballots from union members. If accepted by the jury, such activity would constitute a deprivation of both the ballots as well as appellants' honest services. *Cf. United States v. Jain*, 93 F.3d 436, 441 (8th Cir.1996) (holding that section 1346 extends to private sector schemes), *cert. denied*, —— U.S. ——, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997).

The mail fraud instructions, however, failed to require the jury to find that union officials either defrauded the union of its ballots or provided services that were somehow dishonest. The district court instructed the jury that to convict, it had to find beyond a reasonable doubt that appellants "knowingly devised or knowingly participated in a scheme or artifice to defraud as detailed in [the mail fraud counts] of the indictment." The court described the "general nature" of the alleged scheme to defraud:

> [Appellants] did engage in a variety of conduct in violation of the MBA constitution, by-laws and election procedures, and in violation of [29 U.S.C. §§ 411, 481], including:
>
> — Soliciting and collecting unsealed ballots and voting them in favor of the defendants' interests;
>
> — Soliciting and collecting sealed ballots and unsealing them to determine how a union member had voted;
>
> — Discarding those ballots voted against the defendants' interests and replacing them with duplicates;
>
> — Using U.S. mails to request duplicate ballots in violation of union by-laws and election procedures;
>
> — Using the improperly obtained ballots to replace discarded ballots;
>
> — Using the U.S. mails to send and receive duplicate and original ballots, requests for duplicates, and completed duplicate ballots;
>
> — Causing original and duplicate ballots to be mailed so as to appear that union members had mailed the ballots themselves.

The last six activities involve either some form of tampering with the ballots or a dishonest service, each of which could support a conviction: The second, third, and fifth involve tampering with voted ballots; the fourth and sixth involve obtaining and sending duplicate ballots used to replace discarded ballots without voter authority; and the seventh involves giving the fraudulent appearance that union members had voted and mailed the ballots themselves. In contrast, the first activity—"[s]oliciting and collecting unsealed ballots and voting them in favor of the defendants' interest"—does not necessarily do so. As appellants argue, although the solicitation, collection, and marking of ballots in favor of appellants' interests may violate the union's constitution, by-laws, and election procedures, as well as the civil provisions of the Labor–Management Reporting and Disclosure Act, which prohibit the use of proxy-voting in union elections, those activities do not deprive the union of its property interest in the ballots or amount to a dishonest service. As the Supreme Court put it in *McNally*, to "defraud" commonly means to "'wrong[ ] one in his property rights by dishonest methods or schemes'" and typically involves "'the deprivation of something of value by trick, deceit, chicane or overreaching.'" 483 U.S. at 358, 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). There is nothing inherently dishonest or deceitful about soliciting, collecting, and marking unsealed ballots in favor of appellants' interests. The first activity listed in the jury instruction does not require that the ballots were voted in accordance with the voters' wishes, but neither does it require that the union officials voted them against or without regard to those wishes. Such activity would be dishonest or deceitful only if union officials failed to vote the collected ballots according to the voters' wishes or if they obtained the ballots coercively.

The government argues that soliciting, collecting, and voting unmarked ballots, even if in accordance with members' wishes, violate the mail fraud statute because such conduct breaches appellants' fiduciary duties to the union and its membership to protect their rights to secret ballots and fair elections. We have held, however, that violation of a fiduciary duty cannot, in and of itself,

**1306**

constitute a violation of the mail fraud statute, even if the other elements of a mail fraud conviction exist. *United States v. Lemire,* 720 F.2d 1327, 1335 (D.C.Cir.1983) (" '[N]ot every breach of a fiduciary duty works a criminal fraud.' ") (quoting *United States v. George,* 477 F.2d 508, 508 (7th Cir. 1973)); *see also United States v. Cochran,* 109 F.3d 660, 667 (10th Cir.1997) ("[I]t would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing."). To constitute a deprivation of "honest services," the breach of fiduciary duty must have some element of dishonesty. *See* 18 U.S.C. § 1346. Our analysis in *Lemire,* a pre-*McNally* decision upholding wire fraud convictions, is particularly instructive. Involving an employee whose participation in an outside joint venture created a conflict of interest in violation of his employer's policy, *Lemire* held that breaches of fiduciary duty are criminally fraudulent only when "accompanied by a misrepresentation or non-disclosure that is intended or is contemplated to deprive the person to whom the duty is owed of some legally significant benefit." *Lemire,* 720 F.2d at 1335. The misrepresentation or intentional non-disclosure—two inherently dishonest acts—converted the employee's breach of duty into a deprivation of his honest services as an employee. *Id.; see also United States v. Frost,* 125 F.3d 346, 368 (6th Cir.1997) (involving mail fraud convictions based on scheme to deprive a university of defendants' honest services as its employees because they failed to disclose an alleged conflict of interest). Even if it violates appellants' fiduciary obligations under federal law and union rules, proxy-voting, so long as it is not done coercively or against the voters' wishes, is not necessarily "dishonest."

In sum, the district court's inclusion of the phrase "[s]oliciting and collecting unsealed ballots and voting them in favor of the defendants' interests" as the first of seven activities describing the alleged scheme to defraud inaccurately stated the law. Since the district court failed to instruct the jury that it had to find that appellants engaged in all seven of the alleged activities, the jury could have convicted appellants solely on the basis of the first. Because the government's case emphasized that appellants were guilty of mail fraud by depriving union members of a fair election, and because appellants never disputed that they had engaged in proxy-voting but instead vigorously contested the evidence of tampering and coercion, we cannot conclude with certainty that "the jury charge, read as a whole, . . . reveals that the jury could not have found the defendants guilty on an intangible rights theory," *United States v. Perholtz,* 836 F.2d 554, 559 (D.C.Cir.1988), or that "the guilty verdict actually rendered in *this* trial was surely unattributable to the error," *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Since the district court's erroneous instruction was not harmless beyond a reasonable doubt, *see id.,* we reverse appellants' mail fraud convictions regarding the 1989 and 1990 elections.

## IV. Embezzlement Issues

Appellants assert they were entitled to a judgment of acquittal on the embezzlement count because the government failed to prove the severance payments triggered by the merger of the two unions were unauthorized. Under 29 U.S.C. § 501(c) (1994), a union official "who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or the use of another" union funds is subject to criminal liability. Appellants argue that lack of authorization is an essential element of a § 501(c) violation.

Although we have not squarely confronted this issue, *see United States v. Lawton,* 995 F.2d 290, 294 n. 4 (D.C.Cir.1993), we agree that a § 501(c) violation requires the *unauthorized* appropriation of union property. *See United States v. Stockton,* 788 F.2d 210, 217 (4th Cir.1986). While some of our sister circuits weigh lack of authorization as only one of many factors in determining whether a defendant possessed "fraudulent intent" under § 501(c), *see, e.g., United States v. Welch,* 728 F.2d 1113, 1118 (8th Cir.1984), the language of the statute dictates that it should be considered a distinct element of the offense. Applying the traditional meaning of legal terms, it does not make any

sense to say that a union officer can embezzle, steal, or convert property he is authorized to take.

In this case, appellants argue that no rational jury could have found that the severance payments were unauthorized. They point to evidence establishing: (1) the union's bylaws empowered the District Executive Committee to set compensation for all union officers and employees; and (2) the severance payments were made pursuant to a formal, written severance plan, duly adopted (and subsequently amended) by the Committee in accordance with that authority. But that evidence is not determinative on the matter. At the time the officers' severance fund was created, the Committee set aside an astounding 44% of the union's liquid assets for this purpose. Furthermore, the severance plan was later amended to make the merger of PCD/MEBA and NMU a "triggering event" for payment. Therefore, when the two unions merged, DeFries, Dodson, Daulley, and two others received almost $2 million in "severance" pay even though each immediately assumed a similar job in the merged union. Presumably fearing the membership's reaction to their scheme, appellants employed a strategy of concealment. They did not disclose the severance plan's existence to the union's independent auditor until over one year after its adoption. More important, the membership was kept completely in the dark as to any of its details until after the unions were merged and the payments were made. At the time of the merger referendum, members had no idea that their yes votes would transfer a sizable portion of the union's treasury to appellants' personal pockets. By concealing the severance plan and its terms, appellants prevented the union membership from exercising its authority to terminate or modify the severance payments pursuant to Article 7, Section 3 of the union's bylaws, which authorized the Committee to establish officers' compensation "unless otherwise directed by a majority vote of the membership." As appellants do not dispute that the union's bylaws allowed the union membership to cancel or alter the severance plan, and members, indeed, initiated a civil lawsuit to recover the payments once they were discovered, it is not reasonable to say that the severance payments were "authorized" even accepting appellants' construction of the term. To be sure, under the union's bylaws, the members gave their implicit assent to the Committee's determinations regarding officers' compensation by not reversing their decisions. But, the membership was prevented through appellants' subterfuge from exercising its ultimate authority to prevent this looting of the union treasury, and authorization secured "without disclosure of . . . material information" is a nullity. *See United States v. Butler*, 954 F.2d 114, 119 (2d Cir.1992).

The government further argues that even if appellants had secured authorization for the severance payments in a manner consistent with the union's bylaws, appellants could not have been authorized as a matter of law to breach their fiduciary duty to "hold [union] money and property solely for the benefit of the organization and [the union's] members. . . ." 29 U.S.C. § 501(a) (1994). To be sure, in *United States v. Boyle*, 482 F.2d 755 (D.C.Cir.1973), we held that a union officer could not use authorization as a defense when he converted union funds for a plainly illegal campaign contribution, but the case only stands for the basic proposition that a union officer cannot be "authorized" as a matter of law to engage in specifically proscribed criminal acts. It would extend *Boyle* considerably to hold that an action that would otherwise constitute a breach of fiduciary duty under § 501(a) may not be authorized as a matter of law. On the other hand, a very general delegation in the union's bylaws may not be thought adequate to authorize a manifestly unreasonable specific act. Since we hold that appellants were not authorized, we need not decide this issue.

█ Without even considering the troubling evidence that appellants secured the triggering mechanism for their severance payments through election fraud, there is more than enough evidence in the record to withstand appellants' request for a judgment of acquittal on the embezzlement count. As a fallback position, appellants, however, also assert that a new trial on this count is required because of the district court's failure to properly instruct the jury regarding the

separate authorization element of the offense. At a minimum, they argue the jury should have been instructed that the government was obligated to prove either the lack of authorization or the lack of good faith belief that the payments would benefit the union. While it is true that the jury charge was perhaps imprecise because at one point it subsumed the authorization question into the fraudulent intent inquiry, we are satisfied that the instructions nonetheless adequately described the elements of the embezzlement offense. *See Stockton*, 788 F.2d at 217–18.[6] We detect no reversible error in this aspect of the district court's charge.

Shifting from the authorization element of a § 501(c) violation to the question of intent, appellants argue that the district court's failure to give appellants' requested advice-of-counsel jury instruction constitutes reversible error. Appellants' defense to the embezzlement count was largely based on their reliance on the advice of their outside counsel, Angelo Arcadipane, a partner at Dickstein, Shapiro & Morin. According to testimony presented at trial, Arcadipane advised appellants that the severance payments were completely legal. Because "[g]ood faith reliance upon advice of counsel ... establish[es] a defense" to specific intent crimes, *United States v. Hansen*, 772 F.2d 940, 947 (D.C.Cir.1985), such as § 501(c), appellants assert that the jury should have been given an instruction that good-faith reliance on advice of counsel was a defense to embezzlement.

A defendant is entitled to an advice-of-counsel instruction if he introduces evidence showing: (1) he made full disclosure of all material facts to his attorney before receiving the advice at issue; and (2) he relied in good faith on the counsel's advice that his course of conduct was legal. *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir.1994).[7] The district court is required to give this instruction "if there is 'any founda-

tion in the evidence' sufficient to bring the issue into the case, even if that evidence is 'weak, insufficient, inconsistent, or of doubtful credibility.' " *United States v. Duncan*, 850 F.2d 1104, 1117 (6th Cir.1988) (quoting *United States v. Phillips*, 217 F.2d 435, 443 (7th Cir.1954)). It seems clear to us that the district court abused its discretion by refusing appellants' request for an advice-of-counsel instruction. Misstating the law, the district court observed, "my problem is that the evidence as it stands right now is *equally consistent* with an inference to the effect that the advice of counsel was used as subterfuge as it was that the defendants genuinely and in good faith relied upon it." The district court obviously believed that there was at least the requisite "foundation" for appellants' advice-of-counsel defense but was under the incorrect understanding that appellants instead were obliged to satisfy a preponderance of the evidence standard in order to be entitled to the instruction.

On appeal, the government defends the district court's ruling by claiming that appellants failed to disclose several material facts to Arcadipane and did not rely on his advice in good faith. However, our review of the record indicates that appellants set forth more than sufficient evidence to earn an advice-of-counsel instruction. The government produces a laundry list of supposedly material facts appellants allegedly did not disclose to Arcadipane, focusing on the argument that Arcadipane was unaware of appellants' attempts to conceal the severance plan's existence. The evidence clearly indicates, however, that Arcadipane was generally aware of how the union operated and the degree to which the severance plans had been disclosed to the membership and auditors at the time he issued his final opinion that the payment of the severance benefits was legal. No client ever tells his or her lawyer every single fact that a good lawyer probes before giving advice. Indeed, clients

---

**6.** As in *Stockton,* the definitions of "embezzle" and "converts" given in the jury instructions sufficiently incorporated the offense's lack of authorization element.

**7.** The government argues that we should apply a three-part test. Consistent with *Lindo*, however,

we have not applied the government's second prong. So long as the defendant relies on his counsel's advice in good faith, it is irrelevant whether or not he initially sought the advice in good faith.

do not typically even know which facts a lawyer might think relevant. (That is, in part, why they consult lawyers.) So long as the primary facts which a lawyer would think pertinent are disclosed, or the client knows the lawyer is aware of them, the predicate for an advice-of-counsel defense is laid. Even if we were to regard Arcadipane's advice as questionable, he was adequately informed about the details of appellants' conduct.

The government also argues that appellants did not rely on Arcadipane's advice in good faith because (1) DeFries dictated to Arcadipane the formula and terms of the severance plan; and (2) appellants did not adhere to Arcadipane's advice to limit severance payments to one month's salary per year of service. According to the government, the evidence establishes that DeFries manifested his intent to implement the severance plan before receiving Arcadipane's legal opinion. The government unfairly ascribes nefarious motives to common attorney-client interaction. A client often comes to his lawyer with a plan and asks him to find a way to implement it in a legal manner. Fitting a client's objective into a legally acceptable formula is a large part of lawyering. Similarly, attorneys often advise their clients to act more cautiously than the law requires. It is an important part of a lawyer's job to warn his clients about behavior that, while not illegal, nonetheless has the potential to embroil a client in controversy. Although in this case Arcadipane did suggest appellants reduce the amount of the severance payments in order to minimize the prospect of legal challenge, he ultimately advised that the final version of the plan was legal. If we were to conclude that a client did not "rely" on his attorney's advice in good faith anytime he disregarded one of his attorney's suggestions, the scope of the advice-of-counsel defense would be very narrow indeed.

■ We turn to the question of whether the district court's error is reversible. A refusal to give a jury instruction is reversible error only if the requested instruction "(1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." *United States v. Taylor,* 997 F.2d 1551, 1558 (D.C.Cir.1993).

■ The government does not dispute that the requested advice-of-counsel instruction was substantively correct but maintains that the jury was adequately instructed with regard to appellants' defense. The government points out the jury was informed that the government was obligated to prove that the defendants had acted "with the knowledge that [they] violated the law" and the jury was further told that "the defendants maintain that receipt of the severance payments was done in full compliance … with the advice of counsel." Although the charge allowed the defense to argue in summation that appellants had believed the payments were legal because they had been so advised by Arcadipane, the jury was not exposed to one critical piece of the puzzle: good-faith reliance on advice of counsel was a valid defense that, if proved, required acquittal.

The government's position fails to give due consideration to the prosecutor's conduct in closing argument to the jury. After successfully preventing the defense from obtaining the advice-of-counsel instruction, the prosecutor explicitly told the jury that reliance on Arcadipane's advice "is not a defense" and he informed members of the jury that "[the court] will not read any instruction regarding reliance on Angelo Arcadipane's advice." Reading the jury instructions in their entirety and viewing them in light of the prosecutor's comments, members of the jury were left with the incorrect impression that reliance on advice of counsel was merely an excuse offered by appellants and not a legitimate defense. Appellants were entitled to an instruction explaining the legal significance of their defense and not just a statement summarizing the "defense theory." *See United States v. Newcomb,* 6 F.3d 1129, 1132, 1139 (6th Cir.1993).

Once it is accepted that the advice-of-counsel instruction was not substantially covered by other aspects of the charge, it seems obvious that this omission seriously impaired appellants' ability to present their chosen

defense. Beginning with the opening statement, appellants' main defense to the embezzlement count was that they did not act with fraudulent intent because of their good faith reliance on Arcadipane's advice. But when the district court listed a number of factors for the jury to consider in assessing appellants' intent, it did not even mention the advice of counsel. Not only did this suggest to the jury that appellants' central defense was irrelevant to the question of intent, but when the intent instructions did not mention the specific defense, the jury may have been led to believe that appellants' main defense was actually inconsistent with the law. *See Duncan,* 850 F.2d at 1118. The district court's error seriously prejudiced appellants' ability to receive a fair trial on the embezzlement count.

We, therefore, reverse appellants' § 501(c) convictions.

## V. RICO Jury Instruction

■■■■ Appellants contend that the district court's RICO instruction took away the enterprise element of that offense from the jury, and consequently their RICO and RICO conspiracy convictions must be reversed. We agree.

The district court instructed the jury on the RICO counts, over appellants' objection, that:

> To establish the charged substantive RICO offense with respect to any particular defendant, the Government must prove each of the following five elements, each beyond a reasonable doubt:
>
> ONE: An "Enterprise" as described in the indictment, existed on or about the time alleged in the indictment....

Regarding the first element, the government must prove beyond a reasonable doubt the existence of an "enterprise." As used in these instructions, the term "enter-

prise" includes any individual, partnership, corporation, association, or other legal entity, including a labor union. It applies even to a group of individuals associated in fact although not generally thought of as a legal entity.

The indictment here charges that the enterprise was a union, that is District No. 1–Pacific District Maritime Engineers' Beneficial Association, which has been referred to as District No. 1–PCD/MEBA, its committees, and its successor union, the District No. 1–Marine Engineers' Beneficial Association/National Maritime Union, which has also been referred to as "District No.1–MEBA/NMU."

> *You are instructed that, for purposes of this element of counts one and two, you should regard the two unions as a single enterprise.*

(Emphasis added).

■■■■ Under RICO § 1962(c),[8] "the existence of an enterprise is an essential element of a RICO claim." *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 426 (5th Cir.1987); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995); *United States v. Console,* 13 F.3d 641, 653 (3d Cir.1993). Indeed, "[t]he central role of the concept of enterprise under RICO cannot be overstated." *United States v. Neapolitan,* 791 F.2d 489, 500 (7th Cir.1986). The existence of an enterprise "at all times remains a separate element which must be proved by the Government."[9] *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981).

■■■■ Because "criminal convictions [must] rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a

---

**8.** Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

**9.** To the extent that the government argues that whether the two unions constituted a single enterprise is a matter of law, it is mistaken. "The existence *vel non* of a RICO enterprise is a question of fact for the jury." *Console,* 13 F.3d at 650.

reasonable doubt," [10] if jury instructions remove an element of a crime from the jury's consideration, then those instructions are flawed as a matter of law. *United States v. Gaudin*, 515 U.S. 506, 510, 522–23, 115 S.Ct. 2310, 2313, 2320, 132 L.Ed.2d 444 (1995); *see also Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 2080–81, 124 L.Ed.2d 182 (1993); *United States v. Fennell*, 53 F.3d 1296, 1301 (D.C.Cir.1995).

The district court's RICO instruction did not obligate the government to prove the existence of an enterprise. Instead the instructions on the enterprise element concluded with the admonition that the jury "should regard the two unions as a single enterprise."

The government maintains, nevertheless, that there was no error in the instructions because the district court twice instructed the jury that in order to convict it had to find all elements of a RICO offense beyond a reasonable doubt, and that the government was required to prove the existence of an enterprise as described in the indictment that existed on or about the time alleged in the indictment. The indictment alleged that the enterprise consisted of "District No.1–PCD/MEBA, its committees and its successor union District No. 1–MEBA/NMU, its divisions, committees and conventions." The court's subsequent remarks about the "enter-

prise element," the government contends, must be viewed in conjunction with these general admonitions. But this argument misses the point. The government's attempts to construe the district court's final instruction as a conditional statement are contradicted by the explicit language used by the court—it "instructed" the jury that it "should" regard the enterprise as the one alleged in the indictment. This erroneous command marked the district court's final words on the enterprise element, irreparably infecting the instruction. [11]

Rather than permitting the jury to determine whether an enterprise existed, and, if it did, which unions it included, the instruction removed those questions from the jury's consideration. [12] The district court did not instruct the jury that if it found the two unions had an ongoing organization and functioned as a continuing unit, then they constituted a single enterprise as charged in the indictment. *Cf. United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir.1988); *United States v. Serino*, 835 F.2d 924, 930–31 (1st Cir.1987). As *Gaudin* makes clear, a court must give the jury the opportunity to evaluate whether the government has proven its case beyond a reasonable doubt for every element of the crime charged. *See Gaudin*, 515 U.S. at 510, 115 S.Ct. at 2313–14. The court may never

10. This proposition is rooted in both the Fifth Amendment guarantee that no one will be deprived of liberty without "due process of law," and the Sixth Amendment right to a jury trial "[i]n all criminal prosecutions." *See* U.S. Const. amends. V, VI; *United States v. Gaudin*, 515 U.S. 506, 509–10, 115 S.Ct. 2310, 2313–14, 132 L.Ed.2d 444 (1995).

11. The government's other efforts to rehabilitate the instruction rely on outdated or inapposite cases. *United States v. Barton*, 647 F.2d 224, 231 n. 7 (2d Cir.1981), concluded that a mixed question of fact and law (concerning the interstate commerce element of a RICO charge) could be decided by a court. But following *Gaudin*, "mixed questions of law and fact" must be left for the jury. *Gaudin,.* 515 U.S. at 512–15, 115 S.Ct. at 2314–16; *accord United States v. Parker*, 73 F.3d 48, 51 (5th Cir.1996) (holding interstate commerce element of RICO is a jury question); *United States v. Aramony*, 88 F.3d 1369, 1386–88 (4th Cir.1996) (same). The government's other cases concern district court refusals to give requested multiple conspiracy instructions. Although in some conspiracy cases a district court

may decline to give an instruction containing a defense theory of multiple conspiracies where the defendant has not shown that he is entitled to one, *see, e.g., United States v. Graham*, 83 F.3d 1466, 1472 (D.C.Cir.1996); *United States v. Briscoe*, 896 F.2d 1476, 1514 (7th Cir.1990); *United States v. Orr*, 825 F.2d 1537, 1542–43 (11th Cir. 1987); *United States v. Towers*, 775 F.2d 184, 189–90 (7th Cir.1985); *United States v. McLernon*, 746 F.2d 1098, 1107–08 (6th Cir.1984), it may not direct the jury to find that a particular RICO enterprise existed, as occurred in the instant case.

12. Contrary to the government's contention, this was a contested issue. Although the government maintains that appellants fail to point to any disputed specific facts that the jury was required to resolve in order to determine whether the government had proved the charged enterprise, appellants presented evidence that MEBA/NMU was a fundamentally different union from PCD/MEBA in purpose, structure, and personnel, thereby giving rise to a classic jury question. *Cf. United States v. Perholtz*, 842 F.2d 343, 354 (D.C.Cir.1988).

direct a verdict for the government on an element of a criminal offense, "no matter how overwhelming the evidence." *Sullivan*, 508 U.S. at 277, 113 S.Ct. at 2080; *see also Gaudin* at 510–11, 115 S.Ct. at 2313–14. Yet that was the effect of the district court's instruction in the instant case.

Accordingly, we hold that appellants were denied their right to have the jury determine whether the government had proved beyond a reasonable doubt that the two unions constituted a single enterprise and their RICO and RICO conspiracy convictions must be reversed.[13] *See Gaudin*, 515 U.S. at 510–11, 115 S.Ct. at 2313–14.

## VI. RICO Forfeitures

■■■ Following the return of the guilty verdicts by the jury, the district court ordered appellants to forfeit the salaries that they earned between 1985 and 1990 from both the union and the umbrella organization of which it was a member, the National MEBA (the "national"). Appellants served as officers of the national as well as the union. The court also ordered appellants to forfeit the severance pay that they earned after the merger. Because we reverse appellants' RICO convictions, the accompanying forfeitures must also be reversed. *See United States v. Chavez*, 845 F.2d 219, 222 (9th Cir.1988). To facilitate disposition of the cases on remand, we address several forfeiture issues raised by appellants that present questions of first impression in this circuit. *Cf., e.g., United States v. Burke*, 888 F.2d 862, 869 (D.C.Cir.1989).

### Causal Relationship Between Appellants' Salaries and RICO Violation

■■■ The criminal forfeiture provision of RICO provides:

> Whoever violates any provision of section 1962 . . . shall forfeit to the United States,
> . . .
>
> (1) any interest the person has acquired or maintained in violation of section 1962;
>
> (2) any—
>
>> (A) interest in;
>>
>> (B) security of;
>>
>> (C) claim against; or
>>
>> (D) property or contractual right of any kind affording a source of influence over;
>
> any enterprise which the person has . . . participated in the conduct of, in violation of section 1962; and
>
> (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. § 1963(a) (1988). The government must prove its forfeiture allegations by a preponderance of the evidence.[14] *Cf. Libretti v. United States*, 516 U.S. 29, ——–——,

---

**13.** The district court's failure to allow the jury to decide the enterprise element was, per se, a reversible error. *See Gaudin*, 515 U.S. at 510–11, 115 S.Ct. at 2313–14; *Sullivan* 508 U.S. at 280–83, 113 S.Ct. at 2082–84. The government's reliance on *Johnson v. United States*, —— U.S. ——, ——–——, 117 S.Ct. 1544, 1549–50, 137 L.Ed.2d 718 (1997), as somehow undermining the application of *Sullivan's* per se prejudicial error rule to a *Gaudin* error is misplaced. The Court in *Johnson* engaged in a plain error analysis because the appellant had failed to make an objection to the instruction at trial. It did not decide whether *Gaudin* errors were per se prejudicial errors that affected a defendant's substantial rights, or rather were subject to a harmless error analysis. *See Johnson*, —— U.S. at ——, 117 S. Ct at 1550. Although, as appellants note, the Court has granted certiorari to decide whether failing to instruct the jury on an element can be found harmless where the defendant admitted that element at trial, *see Rogers v. United States*, —— U.S. ——, 117 S.Ct. 1841, 137 L.Ed.2d 1046

(1997), the resolution of that issue has no bearing on the instant case. In *Rogers*, the Eleventh Circuit distinguished the effect of the district court's failure to instruct the jury on an element from a case such as this, where the court directed a verdict on an element. *See United States v. Rogers*, 94 F.3d 1519, 1526 n. 13 (11th Cir.1996). Moreover, appellants make a facially persuasive argument that the error here was not harmless. Because the government chose to allege in the indictment that the two unions constituted a single enterprise that evidenced the pattern of racketeering, the enterprise element is inextricably intertwined with the jury's finding of a pattern of racketeering activity.

**14.** We note that at the request of the government, the district court applied the reasonable doubt standard to the forfeiture allegations. *United States v. DeFries*, 909 F.Supp. 13, 16 n. 3 (D.D.C. 1995).

116 S.Ct. 356, 362–63, 133 L.Ed.2d 271 (1995) (holding that criminal forfeiture is an aspect of sentencing).

The forfeiture provision requires that there be a causal link between the property forfeited and the RICO violation. Thus, only property "acquired or maintained" through racketeering activity or "derived from[ ] any proceeds ... obtained, directly or indirectly from racketeering activity" is subject to forfeiture. 18 U.S.C. § 1963(a)(1), (3). This court has yet to articulate a test for determining whether the government has established an appropriate casual relationship between the property to be forfeited and the statutory violation. Other circuits have assessed the nexus between property and racketeering by applying a but-for test first articulated in *United States v. Horak*, 833 F.2d 1235, 1242–43 (7th Cir.1987). The Seventh Circuit explained that "in order to win a forfeiture order, the government must show ... that [the defendant's] racketeering activities were a cause in fact of the acquisition or maintenance of" the property sought. *Id.* at 1243. The but-for test has been adopted by the First, Second, and Third Circuits. *See United States v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir.1990); *United States v. Ofchinick*, 883 F.2d 1172, 1183 (3d Cir.1989); *United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir.1989). Because the but-for test usefully articulates the requirement of a nexus between the targeted property and the racketeering activity, we adopt it.

Appellants contend that the government failed to establish an adequate causal link between their ballot tampering and the electoral triumphs that afforded them the salaries they forfeited. In their view, the government's causal burden obligated it to establish that their allegedly illegal ballot tampering changed the outcome of the elections they won. Appellants misapprehend what the but-for test requires, at least in this case. The government need not show the election results would have been different absent the alleged racketeering activities. As the district court noted,

> [i]n any election, public or private, involving more than a minimal number of voters or ballots, a rule requiring the government to prove that an alternative outcome would have ensued had the election been untainted would render the victors' offices and emoluments virtually invulnerable to forfeiture.

*United States v. DeFries*, 909 F.Supp. 13, 17 (D.D.C.1995). The district court concluded that appellants' racketeering activity infected the entire election, given that

> [c]ynicism prevailed among the rank-and-file Union members as to the integrity of its electoral processes, making it likely that potential opponents declined to run for office; that an indeterminate number of Union members refused to vote at all; and that others voted for defendants only for self-preservation in the sure knowledge that the secrecy of their ballots would be compromised.

*Id.* These findings, made upon consideration of all the evidence presented at trial and at sentencing, could sustain the necessary causal inference. Appellants cannot contest that but for the elections, which the district court found to be tainted by appellants' racketeering activity, they would not have received their salaries. Their challenge to the district court's application of the but-for test therefore must fail.

*Forfeiture of Pre–Tax Income*

Appellants also contend that the district court erred in forfeiting taxes that they had already paid on their salaries and severance payments.[15] We disagree.

The courts that have directly addressed the tax deduction question have rejected appellants' position. *See United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498 (2d Cir.1985); *United States v. Milicia*, 769 F.Supp. 877,

---

**15.** Appellants further contend that a reversal of the forfeitures should not empower the district court to revisit its finding at the time of sentencing that appellants had no ability to pay any fine or restitution. The district court imposed fines and restitution contingent upon reversal of the forfeiture orders. The government notes, and appellants do not dispute, that the presentence report found that each appellant had the financial ability to pay the fines and restitution if the forfeitures were vacated. However, because we reverse all of appellants' convictions, the district court would have no basis for imposing fines or restitution in the instant case.

889–90 (E.D.Pa.1991), *appeal dismissed,* 961 F.2d 1569 (3d Cir.1992); *United States v. Elliott,* 727 F.Supp. 1126, 1129 (N.D.Ill.1989). Essentially, they reason from Supreme Court decisions and the legislative history of the RICO statute that Congress intended, in allowing forfeiture in a criminal prosecution, to provide an extreme remedy for an extreme situation in which organized crime was corrupting otherwise lawful enterprises and activities with money from illegal drug distribution and other racketeering activities. *E.g., Lizza,* 775 F.2d at 498; *see also Russello v. United States,* 464 U.S. 16, 27–28, 104 S.Ct. 296, 302–03, 78 L.Ed.2d 17 (1983); *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532–33, 69 L.Ed.2d 246 (1981). Although the Seventh Circuit in dicta has interpreted the Supreme Court to have "intimate[d]" in *Russello,* 464 U.S. at 22, 104 S.Ct. at 300, that the RICO Act contemplates forfeiture of "net, not gross, revenues—profits, not sales, for only the former are gains," *United States v. Masters,* 924 F.2d 1362, 1369–70 (7th Cir.1991), two other circuits have disagreed. *See United States v. McHan,* 101 F.3d 1027, 1042 (4th Cir.1996) (noting, in part, that "[t]he proper measure of criminal responsibility generally is the harm that the defendant caused, not the net gain that he realized from his condition"); *United States v. Hurley,* 63 F.3d 1, 21 (1st Cir.1995); *United States v. Saccoccia,* 58 F.3d 754, 785 (1st Cir.1995). Furthermore, even were we persuaded by the view of the Seventh Circuit, in *Masters* the court was concerned with costs and profits, and not with the question whether taxes paid are properly deducted from the forfeiture amount. *See Masters* 924 F.2d at 1369–70. These are different questions, to be treated separately. *See Lizza,* 775 F.2d at 498; *Elliott,* 727 F.Supp. at 1129. As the district court noted in *Elliott,* taxes are more like overhead, which the legislative history of RICO indicates should not be deducted. *Elliott,* 727 F.Supp. at 1129; *see also* S.Rep. No. 98–225, at 199 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3382 (stating that "[i]t should not be necessary for the prosecutor to prove what the defendant's overhead expenses were").

The dissenting judge in *Lizza* suggested, appellants note, that "we lose sight of RICO's basic purpose when we require a RICO defendant to forfeit to the Government that portion of the defendant's unlawfully acquired profits which the Government already has taken by taxing the defendant's income." *Lizza,* 775 F.2d at 499 (Van Graafeiland, J., concurring in part and dissenting in part). However, neither the language of the RICO forfeiture provision nor its legislative history provide support for a deduction of taxes paid from a forfeited salary. RICO's criminal forfeiture provision calls for the forfeiture of "any interest ... acquired ... in violation of section 1962." Congress explicitly directed the courts to interpret the RICO Act liberally to "effectuate its remedial purposes." *See* Organized Crime Control Act of 1970, Pub.L. 91–452, § 904(a), 84 Stat. 947 (1970), *quoted in Russello,* 464 U.S. at 27, 104 S.Ct. at 302. The Supreme Court has concluded from the legislative history that the "statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello,* 464 U.S. at 26, 104 S.Ct. at 302. Indeed, the Court concluded in *Russello* ·that Congress "undoubtedly" chose the word "interest" because it "did not wish the forfeiture provision of § 1963(a) to be limited by rigid and technical definitions drawn from other areas of the law...." *Id.* at 21, 25, 104 S.Ct. at 299, 301. Moreover, the legislative history of the 1984 amendments to the RICO forfeiture provision indicate that the government need not prove net profits when it seeks to forfeit the property of an enterprise. *See* S.Rep. No. 98–225, at 199 ("[T]he term 'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits."). In any event, appellants' construction of "interest" would lead to the anomalous result that taxes could be deducted in those cases where defendants directly deposited their money in a bank account but not in cases where they used their "proceeds" to buy real property.

In addition, a deduction for taxes could create unwarranted complexities in the administration of the statute. The amount of taxes that a person pays depends upon his or her other income as well as on the nature of deductions taken by the taxpayer. ·*See El-*

*liott*, 727 F.Supp. at 1129. Recognizing this difficulty, the majority in *Lizza* concluded that "RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced." *Lizza*, 775 F.2d at 498.

■ Finally, RICO criminal forfeiture differs from other types of forfeiture because it is targeted at the individual wrongdoer, rather than the property sought to be forfeited. *See United States v. $814,254.76 in U.S. Currency*, 51 F.3d 207, 210–11 (9th Cir.1995). The forfeiture is not intended to rectify the unjust enrichment of the individual, but to punish the defendant "upon conviction of violation of any provision of the section ... by forfeiture of all interest in the enterprise." S.Rep. No. 91–617, at 80 (1969). (quoting Department of Justice commentary). RICO forfeitures mark the "revival of the concept of forfeiture as a criminal penalty." *Id.* As the majority in *Lizza* explained, "[f]orfeiture under RICO is a punitive, not a restitutive, measure." [16] *Lizza*, 775 F.2d at 498. It follows that the punitive purpose of the forfeiture provision should not be subverted by a rule that could obscure that purpose with technical tax calculations. Indeed, construing the statute more narrowly could hinder the actualization of this punitive intent.[17]

## VII. Conclusion

For the foregoing reasons, the convictions are reversed.

*So ordered.*

---

16. Thus, to the extent that appellants contend that they "forfeited" a portion of their salaries to the United States when they paid their taxes, their contention is without merit. The payment of taxes is not an in personam criminal penalty. A RICO forfeiture is such a penalty.

17. Appellants' final forfeiture contention, that because the government did not indicate that it would seek forfeiture of the salaries they earned as members of the national in the indictment or in the response to a bill of particulars, it should have been precluded from doing so at the forfeiture hearing pursuant to Rule 7(c)(2), is merit-

less. The government is not required to list all forfeitable interests in the indictment, provided the indictment notifies defendants that the government will seek to forfeit all property acquired in violation of RICO. *See, e.g. United States v. Sarbello*, 985 F.2d 716, 721 (3d Cir.1993); *United States v. Strissel*, 920 F.2d 1162, 1166 (4th Cir.1990); *United States v. Grammatikos*, 633 F.2d 1013, 1024–25 (2d Cir.1980). *De facto* notice, moreover, which appellants had here, can cure defects in a forfeiture pleading. *Sarbello*, 985 F.2d at 721.