**UNITED STATES of America**

v.

**Clayton Eugene DeFRIES, et al.**

**Criminal No. 93–117 (TPJ).**

United States District Court,
D. Columbia.

Dec. 7, 1995.

Stan Mortenson, Stuart A. Levey, Miller, Cassidy, Larroca & Lewin, Washington, DC, for Clayton Eugene DeFries.

Michele A. Roberts, Washington, DC, for Clyde E. Dodson.

Richard Anthony Hibey, Winston & Strawn, Washington, DC, for Reinhold Schamann.

Gerard Treanor, Judith Lynne Wheat, Cacheris & Treanor, Washington, DC, for Claude W. Daulley.

Jeffrey Todd Green, Frank R. Volpe, Sidley & Austin, Washington, DC, for Alexander C. Cullison.

Donald Thomas Bucklin, Squire, Sanders & Dempsey, Washington, DC, for Karl M. Landgrebe.

Stuart Fries Pierson, Davis, Wright & Tremaine, Washington, DC, for Donald K. Masingo.

Penny Marshall, Robert Lewis Tucker, Federal Public Defender for District of Columbia, Washington, DC, for Michael A. Ribera.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Defendants C. Eugene DeFries, Clyde Dodson, Claude Daulley, and Alexander Cullison were elected officers of a labor organization known as District No. 1–Pacific Coast District, Marine Engineers Beneficial Association ("PCD, MEBA"), and its successor by merger, District No. 1–Marine Engineers Beneficial Association/National Maritime Union ("MEBA/NMU"), hereinafter, simply, "the Union." The Union has historically represented the interests of licensed engineering officers on U.S.-flagged merchant vessels.

In June of 1993 defendants were indicted and charged with racketeering and racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961–68 ("RICO"), and various other offenses also charged as racketeering acts, in connection with their conduct of Union affairs. In July, 1995, defendants were convicted by a jury on all counts.[1] The issue of RICO forfeiture has been submitted by consent to the Court.

The government has moved, on the evidence of record, for an order of forfeiture of the aggregate amounts of the gross salaries paid to defendants since 1985 by the Union, plus the total amounts of the so-called "severance payments" disbursed to three of them in or about March of 1988. It does not seek forfeiture of the value of any fringe benefits they may have received, nor of the pensions to which they are entitled as members of the Union.[2]

The Court finds, as did the jury, that the government has proved beyond a reasonable doubt that the defendants are guilty of violations of 18 U.S.C. § 1962(c) and (d). In such cases, 18 U.S.C. § 1963(a) provides, in relevant part:

> (a) Whoever violates any provision of section 1962 . . . shall forfeit to the United States . . .
>
> (1) any interest the person has acquired or maintained in violation of section 1962;
>
> \*    \*    \*    \*    \*    \*
>
> (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . . in violation of section 1962.

Once a § 1962 violation is established, as in this case, the "shall forfeit" language of § 1963(a) imposes a mandatory requirement of forfeiture, and the relationship between the violation and a defendant's property interests is determinative of the latter's amenability to forfeiture. *United States v. Perholtz*, 842 F.2d 343, 369 (D.C.Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). The Court has no discretion to withhold forfeiture or adjust the amount; its function is merely to ascertain if the requisite nexus exists between a property interest sought to be forfeited and the substantive § 1962 RICO violations. Therefore, the principal issue at this stage of the case is whether the government can establish that the salaries and severance payments constitute interests "acquired or maintained" by a RICO violation under § 1963(a)(1), and/or are "proceeds which [the defendants] ob-

---

1. The indictment charged that the defendants fraudulently procured their election and re-election to the Union offices that they held between 1985 and 1990; extorted allegiance to themselves and contributions to the Union's political action fund from Union members while in office; and, in March, 1988, embezzled nearly $2 million in Union assets by making bogus "severance payments" to themselves on the occasion of a merger with another maritime union.

2. From 1985 through 1990, DeFries, Dodson, Daulley and Cullison were, respectively, paid gross salaries totaling $1,590,164, $738,599, $614,819, and $256,270 as officers of the Union.

In or about March, 1988, DeFries, Dodson, and Daulley received one-time "severance payments" of $909,662.37, $394,187.00, and $134,651.00, respectively, from the Union.

The government also asserts that defendants must be held jointly and severally liable for the entire amount they are to forfeit in the aggregate, and for interest on their respective individual liabilities from the date of entry of an order of forfeiture.

tained, directly or indirectly, from racketeering activity" under § 1963(a)(3).[3]

■■■ As a preliminary matter, the Court observes that the RICO forfeiture provisions are to be liberally construed. Early on in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and again in *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), the Supreme Court has expressed its approbation of Congress' desire that the RICO forfeiture provisions be interpreted in a manner consistent with RICO's purposes, *viz.*, "to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Id.* at 26, 104 S.Ct. at 302.[4] The goal of RICO forfeiture was "to remove the profit from organized crime by separating the racketeer from his dishonest gains." *Id.* at 28, 104 S.Ct. at 303. The rule of lenity does not apply. *Id.* at 29, 104 S.Ct. at 303.

## I.

■■■ The government contends that the defendants "acquired" and then "maintained" their Union offices, for which they were paid their salaries, by the Union-wide elections of officers of 1984, 1987, and 1990. According to the evidence, and the jury so found, the elections were fraught with instances of ballot-tampering (by defendants and their agents); surrogate voting (by defendants, of the ballots of others, for themselves); ghost voting (by defendants, of replacement and blank ballots, for themselves); and voting under duress (by Union members fearful of voting for anyone other than defendants).

Assuming that to be so, defendants respond, it is insufficient nevertheless to prove the necessary causal connection between such "racketeering activity" and the salaries they were paid, because it fails to prove a fact that should be deemed essential to a total forfeiture of their salaries, namely, that they would have been defeated for the offices for which they ran if there had been no election fraud. They point to the margins of their respective electoral victories, in comparison to the numbers of ballots the government was able to show at trial to have been actually voted corruptly, from which they argue that, were the Court to discard all tainted ballots (or even count them as having been cast for their adversaries in those elections in which they ran opposed), the vote tallies would not have altered the outcome of the elections.

Although it is not an election fraud case, defendants' principal authority (and a leading case both on salary forfeiture and the § 1963(a) nexus) is *United States v. Horak*, 833 F.2d 1235 (7th Cir.1987), in which an order of forfeiture of a corporate executive's salary was vacated and remanded for a determination of the proportion of his compensation attributable to his crimes. Horak was convicted of mail fraud and substantive RICO violations in connection with bribes he paid to municipal officials to secure garbage collection service contracts for his waste disposal company employer. Horak had obtained his job legitimately, and was on a salary well before he went astray. The district court nevertheless ordered that Horak forfeit his job, as well as his salary, bonuses,

---

3. In this case the government will bear the burden of establishing the nexus between the violation and the targeted property interest beyond a reasonable doubt, as opposed to a preponderance of the evidence, because the government, without conceding the legal issue, has acceded to the application of that standard here despite the conflict among the courts regarding the appropriate standard. (Government's Brief, p. 12, n. 4). The RICO statute is silent on the issue; most of the cases addressing RICO forfeiture fail to discuss or even state the standard, and the cases that do address the issue disagree as to whether the "beyond a reasonable doubt" or the "preponderance of the evidence" standard of proof applies. *Compare*, for example, *United States v. Pelullo*, 14 F.3d 881 (3rd Cir.), *rehearing denied*, 1994 U.S.App. LEXIS 5413 (3rd Cir.1994) (ap-

plying reasonable doubt standard) and *United States v. Ragonese*, 607 F.Supp. 649, 650–51 (S.D.Fla.1985), *aff'd*, 784 F.2d 403 (11th Cir. 1986) (same) *with United States v. Saccoccia*, 823 F.Supp. 994, 997 (D.R.I.1993), *aff'd*, 58 F.3d 754 (1st Cir.1995) (applying the preponderance of the evidence standard since "criminal forfeiture is part of the sentencing process and not an element of the crime itself"). *See also Libretti v. United States*, — U.S. —, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995).

4. *Accord, United States v. Perholtz, supra; United States v. Hurley*, 63 F.3d 1, 21 (1st Cir.1995); *United States v. Lizza Industries, Inc.*, 775 F.2d 492, 498 (2d Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986).

and corporate profit-sharing and pension plans for the period from the date of the bribe until his conviction. On appeal, the Seventh Circuit affirmed the forfeiture of Horak's job, but vacated the remainder of the forfeiture order and remanded for a determination of the extent to which his other interests were in fact "acquired or maintained" in violation of § 1962. *Id.* at 1243. The court of appeals held that, in order to justify its forfeiture motion, the government must demonstrate that Horak's racketeering activities were a "cause in fact" of the acquisition or maintenance of these interests or some portion thereof, or, in other words, whether "but for" his racketeering activities he would not have had some or all of them. *Id.*

Horak's fate on remand is not reported, but the test of forfeitability articulated by the *Horak* court, i.e., the assets a defendant would not possess "but for" his racketeering, has been expressly adopted in cases from at least the First, Second, and Third Circuits.[5] This Court will follow it as well.

In each of those cases, however, as well as the *Horak* case, the connection between the defendants' racketeering activity and ill-gotten gains could be discretely identified, and the latter segregated from assets innocently acquired. In the instant case, so far as the record shows, the *only* original source of the defendants' wealth appears to be the Union of which they corruptly acquired control. That they may have expertly guided the Union to legitimate successes does not obscure the fact that they never legitimately earned the right to exercise authority over its affairs at all, and DeFries, Dodson and Daulley took from it the "severance payments" that they could not rightfully have authorized even had they been lawfully elected. *See United States v. Olson,* 22 F.3d 783, 785–86 (8th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994).

The *Horak* test would operate to defendants' benefit only if the Court were to construe it to impose upon the government the burden of proving, ballot by ballot, the invalidity of each vote ostensibly cast for a defendant, until the vote tally were reversed. The task is impossible, and in cases such as this so exacting a requirement would be inconsistent with RICO's purposes.

In any election, public or private, involving more than a minimal number of voters or ballots, a rule requiring the government to prove that an alternative outcome would have ensued had the election been untainted would render the victors' offices and emoluments virtually invulnerable to forfeiture. There are simply too many variables, and it would give the defendants the benefit of too many unknowns that are truly unknowables. Proof beyond a reasonable doubt has never required proof to a mathematical certainty.

The government has proved here that the ballot-tampering was endemic in every Union hall across the country in every election. Hordes of blank ballots were frequently seen in profusion in the possession, or within easy access, of defendants and their co-conspirators. Completed ballots, supposedly under lock-and-key awaiting the official count, were turned over in cartonload lots to defendants, and returned without inspection to determine if they had been altered. Cynicism prevailed among the rank-and-file Union members as to the integrity of its electoral processes, making it likely that potential opponents declined to run for office; that an indeterminate number of Union members refused to vote at all; and that others voted for defendants only for self-preservation in the sure knowledge that the secrecy of their ballots would be compromised. In short, the elections were a sham and a charade, and were rendered so by defendants' corrupt practices. It will never be known if defendants could have won their offices in fair and honest elections, but it is clear that, "but for" the tainted "elections" that they themselves corrupted, defendants would have held no Union offices at all—and, of course, collected no Union salaries.

---

5. *United States v. Angiulo,* 897 F.2d 1169 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Porcelli,* 865 F.2d 1352 (2d Cir.), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); and *United States v. Ofchinick,* 883 F.2d 1172 (3d Cir.1989), *cert. denied,* 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990).

■ As the government points out, federal labor law generally allows the Secretary of Labor to declare a union election void if fraud "may have affected the outcome," 29 U.S.C. § 482(c)(2), without requiring that he establish that, in fact, it did so. While the Court acknowledges the difficulties presented in transposing a standard for civil relief to the context of a criminal forfeiture, it nevertheless concludes that, in cases such as this, the government need only prove beyond a reasonable doubt that when a Union's electoral process, as distinguished from a readily ascertainable number of individual ballots, is systemically tainted with fraud, and the victors bear responsibility for that fraud, their offices and the attendant salaries are subject to forfeiture.

## II.

■ Having preserved their substantive objections to their convictions for embezzlement with respect to the severance payments, defendants DeFries, Dodson and Daulley object as well to the amount the government seeks to forfeit if their convictions are affirmed. At the time each received his severance payment in or about March, 1988, the Union withheld federal income taxes payable on the sum, so that the net actually received by each was considerably less than the gross amounts they had, as the Union's Executive Committee, approved for themselves. The Union actually remitted the difference withheld to the Internal Revenue Service. Thus, they argue, if they are not given credit for the difference, they will in effect suffer a double forfeiture, and the government will harvest a windfall.

Neither of the cases cited by defendants in opposition to the government's position, however, supports the proposition that federal taxes paid on income illegally earned must (or may) be deducted from a subsequent forfeiture of the same income. *United States v. Ofchinick*, 883 F.2d 1172 (3d Cir.1989), *cert. denied*, 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990), held only that the same sum unlawfully received could not be forfeited twice, once under Section 1963(a)(1), and again under Section 1963(a)(2) or (3). *United States v. Masters*, 924 F.2d 1362 (7th Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991), merely disallowed joint and several forfeiture liability of multiple defendants for a single bribery payment they were shown to have shared.

The government's reply cites one circuit court case, and two district court cases, expressly disallowing a reduction of a forfeiture by the taxes paid on the amount subject to forfeiture. In *United States v. Lizza Industries, Inc.*, 775 F.2d 492 (2d Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986), the court of appeals affirmed an order of forfeiture of profits on a bid-rigged public construction project undiminished by the taxes paid on those profits, holding that, harsh as a forfeiture sanction may appear to be, the only limit imposed by law is that to be found in the Eighth Amendment to the Constitution. "Punishment best fits the crime when forfeiture—as it is in RICO—is keyed to the magnitude of a defendant's criminal enterprise.... Calculation of forfeiture based on gross rather than net profits from illegal activity does not destroy this rough proportionality." 775 F.2d at 498. *See also United States v. Elliott*, 727 F.Supp. 1126, 1129 (N.D.Ill.1989), and *United States v. Milicia*, 769 F.Supp. 877, 889 (E.D.Pa. 1991), *appeal denied*, 961 F.2d 1569 (3rd Cir.1992).

Defendants' argument has a certain equitable sonority to it, and it is not without its adherents. *See* Van Graafeiland, J., dissenting, in *Lizza Industries, Inc., supra*, 775 F.2d at 499. Nevertheless, such authority as exists on the precise issue, which this Court will follow, is unanimously unfavorable to the reduction of forfeitures by the amount of taxes paid on the proceeds of racketeering activity.

## III.

■ Included in the total of nearly $1.6 million in salary paid to DeFries that the government demands he forfeit, says DeFries, is the sum of $977,500.00, paid to him by an entity known as "National MEBA," in annual installments of salary of $195,500 each year from 1986 through 1990, as National MEBA's President. The Dodson salary forfeiture demand of $738,500.00 also includes

$656,980 in salary payments from National MEBA at the rate of $131,396 per year for the same five years during which Dodson served as National MEBA's salaried Secretary–Treasurer.

DeFries and Dodson invoke Fed.R.Crim.P. 7(c)(2), which precludes the entry of an order of forfeiture "unless the indictment . . . shall allege the extent of the interest or property subject to forfeiture," in resisting so much of the forfeitures of their salaries sought here as is shown to have come from National MEBA. Nowhere does the indictment mention National MEBA as a source of gain to them of any description.

The government responds that the forfeiture allegations in the indictment (and reiterated in a bill of particulars), while referring specifically to "payments and benefits received" from PCD, MEBA and MEBA/NMU, also contained an "including-but-not-limited-to" clause, demanding, *inter alia,* forfeiture of "all monies paid as salary and severance payments" without naming the payors. Defendants, however, moved for the bill of particulars which, when the government filed it, once again spoke only of "payments and benefits" from PCD, MEBA and MEBA/NMU.

If, indeed, National MEBA were truly a separate and distinct entity, whose officers were chosen in a manner insulated from the effects of the Union's flawed elections, having its own sources of revenue from which those officers were paid for work done for it, and in its name alone, then the Court would be inclined to hold that DeFries' and Dodson's salaries as National MEBA officers were insufficiently pleaded in the indictment as subjects of forfeiture. But that does not appear to be the case.

Although the record is sparse with respect to the nature of National MEBA, it does reflect that it functioned as something of a loose "umbrella" association of PCD, MEBA (and later MEBA/NMU), a purported "rival" union known as "District No. 2" (that accepted deck officers as well as engineers as members), the "Radio Officers Union," also known as "District No. 3" and other miscellaneous imprecisely affiliated labor organizations. The record does not disclose, however, any discernible distinction between the duties of defendants DeFries and Dodson as officers of the Union itself, and their duties as officers of National MEBA. Nor, for that matter, is it shown that the entities operated discretely and independently in any respect.

The voting members of National MEBA were 21 "delegates" to the Union's National Convention, elected in the same fraudulent elections in which defendants were elected to their Union offices. (Twenty of the 21 delegates were named co-conspirators who actively assisted defendants in rigging the elections.) The delegates, in turn, elected DeFries and Dodson as President and Secretary–Treasurer, respectively, of National MEBA. In short, PCD, MEBA, as the dominant component of National MEBA, controlled the composition of its executive hierarchy.

Even more significant is the fact that National MEBA had no independent sources of income. It was, it appears, supported almost entirely by an annual *"per capita* tax" levied on its constituent components, of which PCD, MEBA's share represented roughly 70 percent of National MEBA's total revenue for each year until 1988. Thereafter, MEBA/NMU's annual *per capita* tax payment exceeded 80 per cent of National MEBA's yearly income. Salaries for its officers constituted the bulk of National MEBA's annual expenditures every year, and DeFries and Dodson were two of its three principal officers for those years. Thus, PCD, MEBA, and later MEBA/NMU, were in fact the sources of the salaries paid to DeFries and Dodson as National MEBA officers. National MEBA was merely a conduit. Therefore, those portions of their salaries ostensibly disbursed to them by National MEBA are subject to forfeiture, as well as those paid directly by the Union itself.

## IV.

Defendants object to the imposition of joint and several liability for the forfeited amounts on the ground that it is both unjust and unnecessary to RICO's purposes in the somewhat unusual circumstances of this case. Here it is known precisely how much each defendant has personally been enriched by

their collaborative racketeering activities. In virtually all other reported forfeiture cases the racketeering proceeds were commingled, disbursed, invested, and/or spent by multiple defendants and related parties in untraceable and unallocable proportions, thus providing a rationale for joint and several liability.

For example, defendants say, in *United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986), *cert. denied*, 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987), the four defendants who objected to their joint and several liability for illegal kickback payments on dental insurance contracts had each received indeterminate amounts over a period of five years through multiple conduit corporations in which they held varying interests. Although the government was able to calculate the aggregate amount of the kickbacks (a fixed percentage of monthly premiums paid), it was unable to determine how it had been allocated. The Eleventh Circuit explained that joint and several liability of more than a single defendant for the total amount of the racketeering proceeds, notwithstanding they were shared, was not only consistent with RICO's purposes but was imperative to the effectiveness of the remedy. Were the government required to prove each defendant's allotted share as the measure (and limit) of his forfeiture liability, "the offenders would simply have to mask the allocation of the proceeds to avoid forfeiting them altogether." 806 F.2d at 1508.

■ The government relies principally on a more recent case from the First Circuit. In determining that four defendants were jointly and severally liable to forfeiture of a total of more than $136 million in laundered drug-money receipts, while various co-conspirators were found liable for lesser fractions of the same sum, the First Circuit approved a "reasonably foreseeable" test employed by the district court. *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir.1995), *affirming United States v. Saccoccia*, 823 F.Supp. 994, 1004 (D.R.I.1993). Joint and several liability or, in other words, vicarious forfeiture liability of one RICO conspirator for some or all of the proceeds generated or received by others, is essential to give assurance that leaders share liability for proceeds handled by their subordinates, but no defendant should be held liable for proceeds he could not reasonably have anticipated as likely to derive from their concerted efforts. 63 F.3d at 20–23.

Applying the teaching of those two leading cases to the instant case, it is clear that, even though the government has been able to show precisely how the Union's money has been divided between defendants over the years they held control of it, joint and several liability is an integral aspect of RICO forfeiture. Consequently each should be held jointly and severally liable for the forfeiture of that portion of the aggregate that he could reasonably foresee as accruing to either himself or his co-conspirators.

■ Defendants DeFries and Dodson, who from the earliest were influential insiders who set the policy, fixed levels of compensation, and drove the conspiracy, foresaw it all. Each shall therefore forfeit his own salary and severance payments, and shall stand secondarily liable, or as surety, for the recovery of assets forfeitable by his co-defendants.

■ Defendants Daulley and Cullison shall likewise forfeit their own salaries, and Daulley shall forfeit own his severance payment. Both shall also be jointly and severally liable for any deficiency in the recovery of salaries paid by the Union to their co-defendants. However, the defendants Daulley and Cullison shall have no vicarious forfeiture liability for the co-defendants' severance payments in any amount since neither had a hand in bestowing, or even became aware of them, until after the event.

For the foregoing reasons, it is, this 7th day of December, 1995,

ORDERED, that the motion of the government for RICO forfeitures of the aggregate salaries paid by the Union (including National MEBA) to defendants for the years 1985–1990, and the severance payments by the Union to defendants DeFries, Dodson, and Daulley in or about March, 1988, are granted, with separate orders of forfeiture to be entered for each defendant; and it is

FURTHER ORDERED, that the orders of forfeiture, and any execution thereon, are stayed pending proceedings on timely appeals taken therefrom; and it is

FURTHER ORDERED, that the Orders of July 20, 1995, to preserve the availability of the defendants' assets to satisfy the orders of forfeiture shall remain in effect during the pendency of any appeals.