**DISTRICT NO. 1—PACIFIC COAST DISTRICT, Marine Engineers' Beneficial Association and National Marine Engineers' Beneficial Association, Appellants,**

v.

**TRAVELERS CASUALTY AND SURETY COMPANY,**
Appellees.

No. 00–CV–737.

District of Columbia Court of Appeals.

Submitted June 12, 2001.

Decided Sept. 27, 2001.

John J. Beins, Rockville, MD, was on the brief, for appellants.

Douglas Mataconis, Falls Church, VA, Edward M. Kay, Fort Lauderdale, FL, and Paul V. Esposito, Chicago, IL, were on the brief, for appellees.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

This appeal presents issues of interpretation of a fidelity bond and, more particularly, a settlement agreement by which the issuer of the bond, Aetna Casualty and Surety Company ("Aetna"), in return for

rights of subrogation and reimbursement, paid for certain losses suffered by the appellant labor Unions (hereafter collectively "MEBA") at the hands of dishonest officers and employees. Upon suit by Aetna's successor in interest, Travelers Casualty and Surety Company ("Travelers"), to enforce its right to reimbursement, the Superior Court granted summary judgment to Travelers, though awarding it only part of the monies claimed. The primary issue on appeal is whether an "excess loss" provision incorporated into the settlement agreement operated to bar any reimbursement to Travelers until MEBA had recovered its entire losses from the wrongdoing in question, something it had not done at the time of judgment (and may never do). In the main, we affirm the judgment of the trial court, but vacate and remand for trial on one aspect of the reimbursement award.

## I. *Background*

In April 1990, Aetna issued a bond ("fidelity bond" or "the bond") to MEBA insuring it against "any loss of funds or other property which the Insured shall sustain ... through the failure of any of the Employees covered hereunder, acting alone or in collusion with others, to discharge faithfully his duties in handling funds or other property of the Insured." The bond limits were $100,000 per employee, but excess coverage was provided for certain employees.[1] In June 1993, a federal grand jury charged MEBA employees DeFries, Dodson, Daulley, Schamann, Cullison, Masingo and others with racketeering, conspiracy to violate the RICO statute, mail fraud, and embezzlement. As later described by the District Court:

> [t]he indictment charged that the defendants fraudulently procured their election and re-election to the Union offices that they held between 1985 and 1990; extorted allegiance to themselves and contributions to the Union's political action fund from Union members while in office; and, in March, 1988, embezzled nearly $2 million in Union assets by making bogus "severance payments" to themselves on the occasion of a merger with another maritime union.

*United States v. DeFries,* 909 F.Supp. 13, 15 n. 1 (D.D.C.1995), *rev'd on other grounds,* 327 U.S.App.D.C. 181, 129 F.3d 1293 (1997).

In July 1993, MEBA filed a claim of loss with Aetna under the fidelity bond, asserting losses from both the embezzlement of severance pay and the salaries paid to the employees who had wrongfully won election and re-election. The claimed losses from the employees totalled $5,400,000. In July 1995, the defendants were convicted as charged, and the District Court subsequently listed the losses caused by several of them as follows:

| DeFries: | Salary | — | $1,590,164.00 |
| | Severance | — | 909,662.37 |
| | Total | — | $2,499,826.37 |
| **Dodson:** | Salary | — | $ 738,599.00 |
| | Severance | — | 394,187.00 |
| | Total | — | $1,132,786.00 |
| **Daulley:** | Salary | — | $ 614,819.00 |
| | Severance | — | 134,651.00 |
| | Total | — | $ 749,470.00 |

---

1. In part, the bond provided the following excess coverage:

C.E. DeFries (President, MEBA & District 1): $400,000
Clyde E. Dodson (Treasurer, District 1): $400,000

Claude W. Daulley (Director, District 1): $400,000
R.F. Schamann (V.P., District 1): $400,000
Alexander Cullison (Collector): $400,000
Donald Masingo (Collector): $25,000

Cullison:  Salary      —  $ 256,270.00
           Severance   —           0.00
           ─────────────────────────────
           Total       —  $ 256,270.00

*DeFries*, 909 F.Supp. 13 at 15 n. 2. A later amended proof of loss made the total claims for severance losses $1,438,500 and for salary losses $2,588,934.

Aetna disputed MEBA's claims on several grounds, apparently including one that mere payment of salaries to a dishonestly-elected employee was not a covered loss under the fidelity bond.[2]  In May 1996, the parties settled the dispute by a written agreement providing that Aetna would pay MEBA $1,028,838.37 and MEBA would release all claims of loss to Aetna.  Paragraph 3 of the agreement provided:

> AETNA and the Insured acknowledge and agree that AETNA has certain subrogation rights by reason of having made the aforesaid payment pursuant to the terms of the Bond. The Insured also agrees that, in return for the aforesaid payment, it assigns all rights, title and interest, except as limited in the next numbered paragraph, in all claims for the amount of the aforesaid payment which it may have against its officers, officials and employees and any other parties who acted in concert therewith by reason of conduct upon which its claims against AETNA have been made and pursuant to which AETNA makes the aforesaid payment.

These subrogation rights were in turn limited by paragraph 4, which stated:

> a.  Subject to the excess loss provisions set forth in the Bond, AETNA and the Insured will share in the recovery of any monies not exceeding the amount of the aforesaid payment received either through the Court, from the United States Government, or directly from Messrs. C.E. DeFries, Clyde Dodson and Claude Daulley, with AETNA receiving 75% and the Insured receiving 25% of any monies so recovered until AETNA has received 75% of the aforesaid payment to the Insured.

> b.  It is expressly understood that the preceding sharing agreement does not apply to the first $409,662.37 of any recovery of monies from C.E. DeFries. Such amount will be the sole property of the Insured.  If additional monies beyond the $409,662.37 are recovered from C.E. DeFries[,] ... the sharing agreement specified in the preceding paragraph ... will be applicable to such additional recovery.

MEBA later filed a civil restitution action to recover embezzled money from DeFries and Dodson, reaching a settlement with them in which it received $403,036.95 from DeFries and $515,000 from Dodson. Following this settlement, MEBA advised Aetna of its recoveries and claimed that under paragraph 4(a) of the agreement—which specifically incorporated the "excess loss" provisions of the fidelity bond—it was entitled to keep all of the funds.  Aetna disagreed, asserting that it was entitled to 75% of the recovery.  When the dispute could not be resolved, Aetna's successor in interest, Travelers, brought suit in Superior Court claiming breach of the settlement agreement.  During discovery, Travelers learned that MEBA had recovered monies from other wrongdoers as well.  Specifically, in interrogatory responses MEBA disclosed that in December 1996 the District Court had ordered Cullison to pay restitution of $114,520.10, and that MEBA had earlier settled with Masingo and Scham-

---

**2.**  As the trial judge pointed out, the exact *reasons* Aetna disputed the claims do not appear in the record, but in the ensuing litigation Travelers consistently disclaimed liability for the salary losses.

ann for restitution of $310,759.48 and $358,399.71, respectively.

Following discovery, the parties both moved for summary judgment. MEBA relied on the excess loss provision of the fidelity bond, which provided:

> If the Insured shall sustain any loss covered by this bond which exceeds the amount of indemnity provided by this bond, the Insured shall be entitled to all recoveries ... by whomsoever made on account of such loss under this bond until fully reimbursed, less the actual cost of effecting the same; and any remainder shall be applied to the reimbursement of the Underwriter.

MEBA accordingly argued that to be "made whole" under this provision it was entitled to recover both the severance pay and salary losses from the wrongdoers before Travelers was allowed any reimbursement.[3] Travelers, to the contrary, asserted that it was entitled to $974,009.47, representing 75% of the $1,298,679.29 MEBA had received from the named wrongdoers other than De-Fries. (It conceded that under paragraph 4(b) of the settlement, the $403,036.95 recovery from DeFries belonged to MEBA.) Travelers maintained that wrongly procured salaries were not covered by the fidelity bond and that, in any case, MEBA had waived any claim that they were by settling with Aetna for less than the total loss. Travelers thus asserted that no excess loss remained to be set off against its right to reimbursement. Furthermore, on the basis of MEBA's interrogatory answers, Travelers argued that the agreement entitled it to part of the money recovered from Masingo and Schamann, and

that it would amend its complaint accordingly.

The trial judge granted Travelers' motion for summary judgment, but awarded it $606,399.73, considerably less than the total requested. Under paragraph 3 of the settlement agreement, the judge concluded that MEBA was required to reimburse Travelers for the severance pay losses it recovered from the wrongdoers, but not for the salary losses recouped. The judge reached that conclusion primarily because the settlement payment corresponded exactly to the sum of severance pay losses caused by DeFries, Dodson, and Daulley up to the limits of the fidelity bond. Regarding the limitations on Travelers' rights set forth in paragraph 4, he ruled that the excess loss provision incorporated in paragraph 4(a) similarly referred only to any excess over *severance* pay losses, not MEBA's total loss (severance pay plus salaries). Since MEBA had received full restitution of the severance pay losses caused by Dodson and Daulley (and could retain all amounts recovered from DeFries), the excess loss provision did not preclude Travelers' reimbursement from the severance pay recovered.[4] The judge further determined that Masingo and Schamann were covered by the assignment of rights to Travelers (indeed they were not subject to the 75% / 25% sharing formula), but that Travelers had failed to prove any loss of severance pay at the hands of Schamann, as well as Cullison. All told, the trial judge allocated the monies recovered from the wrongdoers as follows:

| | Amt. Rec'd | Travelers | MEBA |
| --- | --- | --- | --- |
| DeFries | $403,036.95 | $ 0 | $403,036.95 |

---

**3.** MEBA also relied on the common-law "make whole" doctrine to support its argument.

**4.** The judge similarly rejected MEBA's reliance on the common-law "make whole" doctrine, holding this to be a "default rule" applicable in the absence of contractual language settling the parties' respective rights.

| | | | |
|---|---|---|---|
| Dodson | $394,187.00 | $295,640.25 | $ 98,546.75 [5] |
| Masingo | $310,759.48 | $310,759.48 | $ 0 |
| Cullison | $114,520.10 | $ 0 | $114,520.10 |
| Schamann | $358,399.71 | $ 0 | $358,399.71 |
| Totals | | $606,399.73 | $974,503.51 |

MEBA moved to correct or amend the judgment, contending for the first time that Masingo—with whom MEBA had settled its claims months before entering the agreement with Travelers—was not within the scope of the reimbursement rights MEBA had granted Travelers. Denying the motion, the judge found no manifest error in his interpretation of the agreement to include Masingo, and no excuse for MEBA's previous failure to oppose Travelers' claim for reimbursement from Masingo.

## II. *Discussion*

MEBA makes three primary arguments on appeal, all directed to the award to Travelers (wholly or partly) of money recovered from Dodson and Masingo. It contends first that the trial judge erred in holding that its right to recover excess losses before Travelers could be reimbursed at all was limited to severance pay losses and did not include lost salaries. Since it has never received full restitution of the salaries the corrupt officials paid themselves, MEBA argues that Travelers is entitled to no portion of the monies recovered from the wrongdoers. MEBA further argues, in any case, that the settlement agreement gave Travelers no reimbursement right to money recovered from Masingo because Travelers paid no losses caused by Masingo. Finally, MEBA argues that the trial judge erred in calculating the portion of the Dodson recovery awardable to Travelers.

■ This court reviews *de novo* a trial court's order granting summary judgment. *See Nat'l Trade Prods. v. Info. Dev. Corp.,*

728 A.2d 106, 109 (D.C.1999). In a contract case such as this one, "summary judgment is appropriate where [the] contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983). Whether a contract is ambiguous is a question of law, which this court also decides *de novo. See Sacks v. Rothberg,* 569 A.2d 150, 154 (D.C. 1990). A contract is not ambiguous merely because the parties dispute its meaning, *Washington Props., Inc. v. Chin, Inc.,* 760 A.2d 546, 548 (D.C.2000); nor is it ambiguous merely because its terms are complex or "could have been clearer." *Garmany v. Mission Ins. Co.,* 785 F.2d 941, 945–46 (11th Cir.1986) (fact that policy "could have been clearer in setting forth the threshold point for the onset of . . . coverage . . . does not mandate the conclusion that the policy was legally ambiguous"). A contract is ambiguous, permitting resort to extrinsic evidence for its interpretation, when it is "reasonably or fairly susceptible of different constructions or interpretations." *Washington Props.,* 760 A.2d at 548 (quoting *Holland,* 456 A.2d at 815). Because determination of what the contracting parties intended is an objective inquiry, the first step—and often the final one—is to decide what a reasonable person in the position of the parties would have thought the terms of the contract meant. *Id.*

### A. *Recovery of Excess Losses*

■ Travelers does not dispute that paragraph 4(a) of the settlement agreement made its right to reimbursement "[s]ubject to the excess loss provisions set forth in the Bond," which in turn allowed

---

**5.** Although the total recovery from Dodson had been $515,000, the judge divided only the portion of it representing severance pay losses.

MEBA to recover "any loss covered by this bond which exceeds the amount of indemnity provided." The trial judge concluded, however, that the settlement agreement unambiguously reflected the parties' understanding that, in the context of the settlement, the "loss[es] covered by this bond" meant only severance pay loss, not salary loss. For the following reasons, we think the judge was correct.

*First,* in return for the payment of $1,028,838.37, MEBA released Aetna/Travelers broadly "from all, and all manner of, actions, causes of action, ... losses, ... defenses, set-offs, ... claims [and] demands" that MEBA might otherwise have against the insurer. Paragraph 2. Further, subject only to the limitations contained in paragraph 4, MEBA "assign[ed]" to Travelers "all its right, title, and interest ... in all claims for the amount of the aforesaid payment which it may have against its officers [and] ... employees ... by reason of conduct upon which its claims against AETNA have been made and pursuant to which AETNA makes the aforesaid payment." Because the payment was the quid pro quo for this release and assignment, exactly what that sum was meant to cover is clearly probative of the rights the parties understood MEBA to be transferring and those it was reserving. MEBA does not dispute that the $1,028,838.37 was in payment of its submitted severance pay losses only, reflecting the precise amount of those losses (up to the indemnity maximum) caused by the named wrongdoers. MEBA frankly acknowledged in the trial court that the payment "reflects the full amount of severance pay that was embezzled by DeFries, Dodson and Daulley, that was covered under the fidelity bond." The broad release and assignment of rights, together with the intended object of the settlement payment, are substantial evidence that the only "set-off" right MEBA reserved was for excess losses of the kind Travelers agreed to pay (and for which it gained subrogation rights), *i.e.,* severance pay embezzlement.

*Second,* as Judge Burgess recognized, paragraph 4 itself illustrates the parties' understanding that the excess loss provision of the bond was incorporated into the settlement agreement only to the extent that it covered severance pay loss. Although generally the parties were to share in the recovery of monies up to the settlement amount on a 75%/25% basis, paragraph 4(b) provided that the first $409,662.37 of money recovered from De-Fries "will be the sole property of the Insured." That amount was the precise *severance* pay loss MEBA claimed for De-Fries over and above the $500,000 indemnity limit in the policy (MEBA had also claimed sizeable salary losses to DeFries.) Hence, when the parties wanted to explain the excess loss right MEBA was reserving, they knew how to do so. The fact that no similar provision was inserted as to Dodson and Daulley confirms the scope of that right, since neither of them had embezzled severance pay in excess of $500,000.

*Third,* construing MEBA's right to recoup excess losses as including salary losses would defeat the evident purpose of the sharing arrangement in paragraph 4(a). Travelers was to receive 75% and MEBA 25% of monies recovered up to the amount of Travelers' payment. (As previously noted, paragraph 4(b) excludes the excess loss recovered from DeFries from that arrangement.) The natural, if not the obvious, role of this provision was as a hedge favoring MEBA against the possibility that it would not recover its total losses. But if, as MEBA argues, Travelers was entitled to *no* reimbursement until MEBA recovered all its losses, the sharing formula would amount to a 25% bonus for MEBA in the event it succeeded in being made fully whole. MEBA offers no reason why

Travelers would have consented to such a windfall.[6]

■ For these reasons, we reject MEBA's reading of the limitation which paragraph 4 places on Travelers' right of reimbursement. As explained by the trial judge, the agreement reflected the parties' intent to achieve a form of rough justice by allowing MEBA "to be made whole to the extent of salary losses (for which it was not paid under the agreement), but ... provid[ing] explicitly for sharing of some of the recovery of severance losses." On this issue, we agree with the trial judge that there is no ambiguity in the agreement. We also reject MEBA's argument that the common law "make whole" doctrine requires a different result. It generally provides that if an insurer pays less than the insured's total loss, the insurer cannot exercise a right of reimbursement or subrogation until the insured's entire loss has been compensated. *See* 16 COUCH ON INSURANCE § 61:64 (2d ed.1983). The doctrine, however, "operates as a default rule," and so "the parties can contract out of [it]" provided they do so with sufficient clarity. *Cagle v. Bruner*, 112 F.3d 1510, 1521 (11th Cir.1997); *see also, e.g., Culver v. Ins. Co. of N. Am.*, 115 N.J. 451, 559 A.2d 400, 402–04 (1989). In the present case, the parties—both sophisticated negotiators represented by counsel—settled their differences by specifically balancing MEBA's right to be made whole against

Travelers' right to reimbursement: giving MEBA any salary losses recovered and Travelers a portion of severance pay losses recouped. Neither law nor equity authorizes this court to override that agreement.

## B. *Masingo*

■ Assuming that the trial court properly sustained Travelers' right to part of the money recovered from Dodson, MEBA argues that it erred in awarding Travelers any of the funds recouped from Masingo.[7] Citing paragraph 3 of the agreement, MEBA asserts that Travelers "ma[de] the aforesaid [settlement] payment" strictly to cover severance losses caused by DeFries, Dodson and Daulley, not "by reason of ... and pursuant to" any wrongdoing by Masingo. It points further to the facts (i) that, unlike the post-agreement recoveries from those officials, MEBA settled with and released its claims against Masingo months before entering the agreement with Travelers; and (ii) that neither in its informal demands nor in its complaint did Travelers request reimbursement from the Masingo recovery. At the least, MEBA asserts, these facts necessitate a trial on the issue of whether Masingo was within the intended scope of the assignment of claims to Travelers.

Travelers responds that, in citing the release provision, MEBA elides the critical language that MEBA assigned to Travelers "all claims for the amount of the afore-

---

**6.** Travelers makes an additional argument against MEBA's position based on the fidelity bond itself, contending that the bond did not cover salary fraud losses "because MEBA must pay salaries under the best of circumstances" and has offered no proof "that the co-conspirators received salaries in excess of the ... amounts [properly elected officials would have received]." There is practical sense to the point that Travelers would not have agreed to indemnify MEBA for salaries wrongfully obtained (through election fraud) but not exceeding those MEBA would have

had to pay anyway. We do not rely on this point, however, because Travelers has cited to us only the barest authority regarding the scope of fidelity bonds providing broad coverage, as this one did, for any failure of an employee "to discharge faithfully his duties in handling funds ... of the Insured."

**7.** Indeed, as explained earlier, since the sharing formula did not expressly cover Masingo, the trial judge awarded Travelers the entire $310,759.48 recovered from him.

said payment which it may have against its officers, officials, and employees *and against any other parties who acted in concert therewith*" (emphasis added)— words broadly embracing all co-conspirators, named or unnamed in the agreement, in Travelers' right to reimbursement. Travelers asserts that the original complaint did not reference the Masingo recovery only because it did not learn of the recovery until MEBA revealed that fact in its answers to interrogatories. Moreover, it argues that MEBA waived the claim of inapplication of the agreement to Masingo by failing to raise it until after the trial judge granted summary judgment.

Whether the settlement agreement entitled Travelers to reimbursement from the Masingo recovery is not a question readily answered on summary judgment. Except as limited by paragraph 4, the assignment of rights does appear to release to Travelers all claims MEBA has against anyone acting in concert to cause the wrongdoing covered by the bond; and in its interrogatory answer MEBA implicitly acknowledged Masingo to be among those wrongdoers. At the same time, however, the claims transferred to Travelers are those MEBA *"may* have against its officers" (emphasis added), and, as MEBA asserts, it released its claims against Masingo by settling with him months before the agreement with Travelers was entered. Moreover, MEBA argues that if the agreement were meant to include the Masingo recovery, there is no reason why he would have been omitted—as he was—from the sharing formula that left 25% of any recovery to MEBA.[8]

We do not reach the merits of that issue, however, because we conclude that the trial judge did not abuse his discretion in refusing to consider it for the first time in MEBA's post-judgment motion for reconsideration. In moving for summary judgment, Travelers had asked for 75% of all monies recovered from the three officials named in the complaint "and their co-conspirators." It asserted that MEBA had recovered $438,000 from DeFries, $515,000 from Dodson, and $669,159.19 "from the co-conspirators." Citing MEBA's interrogatory answers related to Masingo and Schamann, Travelers stated that when it filed the complaint "it was under the belief that [MEBA] had recovered only $515,000 from Dodson," but that "[d]uring discovery, [MEBA] revealed that they had also recovered $669,159.19 from co-conspirators." (Interrogatory answers 6 and 7 stated that in the Masingo settlement MEBA had recovered $310,759.48, and in an agreement with Schamann $358,399.71.) Travelers thus claimed entitlement "to a share of [MEBA's] recovery from the co-conspirators" as well, stating that it would "amend its complaint to conform the pleadings to the proof and add this claim to its complaint."

In opposing Travelers' motion, MEBA did not address the intended amendment and argument that Masingo was within the scope of the agreement. Although it cited to the "by reason of . . . and pursuant to" language of paragraph 3, it did so only to rebut Travelers' argument that the excess loss provision of the bond not cover salary losses. If that were so, MEBA said, then Travelers would have no claim to recovered salaries because it had not paid MEBA anything "by reason of" the salary embezzlement. (Judge Burgess agreed, as we have seen, that Travelers' had no claim against recovered salary losses.) But, importantly, MEBA did not seek to rebut Travelers' assertion that whatever rights it had against DeFries, Dodson and Daulley

---

**8.** MEBA also disputes as a matter of fact, though weakly, Travelers' assertion that it did not learn of the Masingo recoupment until discovery.

it also had against Masingo, requiring only formal amendment of the complaint. MEBA did not argue that, regardless of the rights assigned as to those wrong-doers, the Masingo recovery was outside the scope of the agreement—as shown by the prior conclusion of the Masingo settlement, the absence of informal or formal demand for part of that recovery, or other facts. On this issue, MEBA's response failed the test of Super. Ct. Civ. R. 56(e) which states that, "[w]hen a motion for summary judgment is made and supported as provided in this Rule, ... the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."

■ MEBA raised the issue for the first time in moving for reconsideration under Rule 59(e) or, alternatively, Rule 60(b). Motions under either rule are committed to the broad discretion of the trial judge. *See Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801, 810 (D.C.1984) (Rule 59(e)); *McMillan v. Choice Healthcare Plan, Inc.*, 618 A.2d 664, 667 (D.C.1992) (Rule 60(b)). A timely motion asserting that the court committed an error of law is normally treated under Rule 59(e), *In re Tyree*, 493 A.2d 314, 317 n. 5 (D.C.1985); but one "requesting consideration of additional circumstances" is properly considered under Rule 60(b). *Wallace*, 482 A.2d at 804. MEBA contends the trial judge committed legal error in holding Masingo to be within the scope of the agreement, or at least in doing so as a matter of law, but its motion plainly asked the judge to consider new circumstances—*i.e.*, the newly-minted claim that the agreement did not include Masingo based on (for example) the timing of MEBA's settlement with him and Travel-

ers' earlier failure to make informal or formal demand for that recovery.

■ Regardless of how MEBA's motion is characterized, neither Rule 59(e) nor Rule 60(b) is designed "to enable a party to complete presenting [its] case after the court has ruled against [it]." *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir.1995). Both rules embody notions of due diligence. 11 C. WRIGHT, A. MILLER, AND M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1, at 127–28 (1995 ed.) ("The Rule 59(e) motion may not be used to ... raise arguments or present evidence that could have been raised prior to the entry of judgment"); [9] *id.* § 2857, at 260 (cases applying Rule 60(b) "have been unyielding in requiring that a party show good reason for the failure to take appropriate action sooner"). MEBA offered the trial judge no reason for its failure to dispute earlier Travelers' claim for belated inclusion of Masingo in its demand for relief. It did not assert, for example, that incomplete discovery had prevented it from asserting facts tending to show that he was outside the reach of the agreement. As Judge Burgess recognized, MEBA's opposition to summary judgment essentially consisted of its own motion for judgment contending as a matter of law that its make-whole right trumped any entitlement to reimbursement that Travelers had. No argument was made that Masingo (or Schamann) was outside the reach of the agreement altogether.

■ In these circumstances, the trial judge did not abuse his discretion in denying the post-trial motion. Award of the Masingo severance pay recovery to Travelers was not manifestly erroneous. *See* WRIGHT, *supra*, § 2810.1, at 125–26 (Rule 59(e) is available "to correct manifest er-

---

**9.** *See also Coleman v. Lee Washington Hauling Co.*, 388 A.2d 44, 46 n. 5 (D.C.1978) (Rule 59(e) motion "must ... be addressed to matters already of record").

rors of law or fact" or to prevent "manifest injustice"). Moreover, the judge was not required to consider a new argument and new facts that MEBA could not justify failing to present to the court earlier.[10]

### C. *Apportionment*

■ MEBA's remaining argument[11] is that, in applying the sharing formula of the settlement, the trial judge erroneously apportioned between severance pay and salary loss the $515,000 that MEBA had recovered from Dodson. In return for that sum, MEBA had released Dodson from all claims in a civil action it brought to recover "[s]everance payments and other monies" he had received from MEBA. In the criminal case, the District Court had previously determined that Dodson embezzled $394,187 in severance pay and $738,599 in salary, a total of $1,132,786. Judge Burgess concluded that the $515,000 settlement with Dodson represented *full* payment of the severance embezzlement, with the rest going to non-severance losses. He therefore awarded Travelers $295,640.25, or 75% of the severance amount embezzled.

MEBA argues that since only 35% of its total claimed loss of $1,132,687 from Dodson[12] was severance pay (*i.e.*, $394,187), the trial judge should have assumed that 35% of the recovery was for severance pay and the rest was for salary. Apportioned in this way, only $180,250 would have been subject to sharing, and Travelers would have been awarded $135,187.50 in relation to Dodson. Travelers replies that MEBA seeks to profit from a problem it created itself by failing to allocate between severance pay and salary losses in the agreement with Dodson. It cites decisions establishing that in circumstances such as these the burden of proving allocation lies with the party that had control of the litigation, here the dispute—and settlement—between MEBA and Dodson. *See, e.g., Ortiz v. Great S. Fire & Cas. Ins. Co.,* 597 S.W.2d 342, 344 (Tex.1980).

■ We have no quarrel with that principle, and, as this court has recognized, summary judgment analysis properly includes consideration of which party has the burden of proof. *See Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979). But the question is still whether the trial judge could fairly determine as a matter of law the allocation between severance pay and salary which the Dodson settlement intended. We do not think so. On the hypothesis the judge accepted, fully 75% of the Dodson recovery was for severance pay even though only 35% of the loss MEBA claimed from Dodson was attributable to that source. Ignoring a discrepancy that large on summary judgment—without any explanation for it and netting an award to Travelers $160,000 above what

---

**10.** That that argument and those facts clearly would have been relevant to the correctness of summary judgment distinguishes this case from *Allstate Ins. Co. v. Ramos,* 782 A.2d 280 (D.C. 2001), in which we hold that the defendant-insurer's request to conform the jury's verdict to the coverage limit of the policy was properly raised by a post-verdict motion.

**11.** MEBA asserts briefly, and broadly, that Travelers was estopped from suing at all under the settlement agreement because it had not proceeded directly against the wrong-doers to recoup its payment. As the trial judge recognized, nothing in the agreement required Travelers to do so before enforcing its rights under the agreement. Moreover, those rights were derivative of MEBA's, and MEBA's settlements with and release of claims against the various wrongdoers posed obvious difficulties—foreseeable when the agreement was drafted—for any independent action against them by Travelers.

**12.** This differed insignificantly from the dollar loss found by the District Court.

strict proration would produce—is seriously disturbing; it makes MEBA's failure to expressly allocate in the Dodson settlement resemble a forfeiture, something the law generally disfavors. We conclude that a trial on this issue is necessary, at which evidence may be adduced—including, perhaps, allocations made in agreements between MEBA and the other wrongdoers—and a finding made as to the apportionment which the parties intended of the Dodson recovery.

### III. *Conclusion*

The judgment is affirmed in part and reversed in part, and remanded for further proceedings in accordance with this opinion.

*So ordered.*